247 So.2d 236 (1971)
Albert LAUZON
v.
J. C. TRAHAN DRILLING CONTRACTOR, INC.
No. 4312.
Court of Appeal of Louisiana, Fourth Circuit.
April 5, 1971.
Dissenting Opinion April 15, 1971.
Rehearing Denied May 10, 1971.
Writ Refused June 24, 1971.
*237 Perez, Fernandez & Seemann, Melvyn J. Perez, Manuel A. Fernandez, G. Frederick Seemann, Chalmette, for plaintiff-appellee.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John V. Baus, New Orleans, for defendant-appellant.
Before SAMUEL, REDMANN and GULOTTA, JJ.
GULOTTA, Judge.
This is an appeal from a judgment awarding damages in the sum of $124,880.40 with legal interest thereon and costs in favor of Albert Lauzon, plaintiff-appellee and against J. C. Trahan Drilling Contractor, Inc., defendant-appellant.
The plaintiff is the owner of an oyster lease in Lake Eloi in St. Bernard Parish consisting of approximately 133 acres. The defendant, J. C. Trahan Drilling Contractor, Inc., is the owner by assignment of a certain lease for mineral production covering the same geographic location as the oyster lease of the petitioner. There was a stipulation entered into the record to the effect that State Lease 4039 issued by the State Mineral Board to James E. Wright, Jr., on October 25, 1962, was recorded with the Clerk of the Parish of St. Bernard on November 23, 1962. This lease was assigned as herein above set forth to Trahan Drilling Contractors and was dated January 21, 1963, and recorded in the Parish of St. Bernard on March 27, 1963. It was further stipulated that the lease of water bottoms for oyster purposes was issued in favor of Albert Lauzon and Carlo Venturello by the Wildlife and Fisheries Commission of the State of Louisiana dated September 30, 1963, recorded in St. Bernard Parish on October 14, 1963.
There was further evidence of a sale of a lease interest dated December 14, 1962, including Lease No. 17395 for 133 acres in Lake Eloi, St. Bernard Parish, from Carlo Venturello to Albert Lauzon. The sale was not recorded with the Clerk of Court of St. Bernard Parish.
Surveys introduced in evidence show that the designation for the placement of a site for drilling by defendant drilling contractor *238 was within the boundaries and on the oyster lease property of the plaintiff herein and located in the eastern part of the leased area.
In order that access be gained to the drilling site, it was necessary that a canal be dredged by defendant company from Bayou Eloi, west of the oyster lease area southeast to the drilling location. The defendant company dredged a canal approximately 65 to 70 feet in width and approximately 7 to 9 feet in depth at the site.
While plaintiff recognizes the right of the defendant company to dredge a canal in order to permit ingress and egress to the well site as authorized by the lease granted to defendant company by the Wildlife and Fisheries Commission of the State of Louisiana, nevertheless plaintiff contends that the canal was not dredged in a reasonably prudent manner in order that damages to the oyster reef and lease owned by the plaintiff might be minimized. Plaintiff contends that the canal should have been dredged 500 feet to the north and east of the original proposed location of the canal in accordance with the recommendation of two expert biologists, Andrew C. Friedrichs, Jr., and Dr. Harry Bennett, both of whom made onsite inspection of the leased area in Lake Eloi on October 13, 1963.
The contention of the defendant is that they did construct the channel or canal in accordance with the recommendations of the experts, that is 500 feet north and east from the original designated location.
The particular area for the proper location of the channel is in dispute and therein lies the paramount question of fact in this case as it relates to whether or not reasonable prudence was used by defendant company to minimize damage to the oyster reef. The second issue of fact in this matter relates to a question of the amount of damages.
The record reflects that the original location designated for the dredging of the canal would transgress the most fertile part of the plaintiff's oyster lease; this area being the northwest portion of the leased area. Sampling of the oyster bed by both experts indicated that a revised plan should be made for the dredging of the canal which would in effect take the canal off the leased area to a large extent by dredging north of the proposed original area and doglegging south to the well site. The proposed original channel would have been a straight channel from northwest of the leased area in a southeasterly direction to the drill site. The revised and recommended proposal of the experts for both the plaintiff and the defendant was that the canal commence 500 feet north of the original site and that the canal be dredged east and then south to the well site thereby avoiding the leased area by having the canal located north of the area of plaintiff's lease.
The record reflects that damage to the oyster bed is caused not only by the destruction of the reef in the area that is dredged, that is the 65 or 70 foot width of the canal, but also by the spread of sedimentation and silt from the spoil bank deposited on both sides of the dredged canal. The silt and sedimentation on the reef kills and destroys the oysters in the area not only in the path of the dredged canal, but also in the areas outlying from the path of the dredged area. The record reflects that the length of the canal was approximately one-half mile from the point of commencement to the drill site. The size of the leased area is 133 acres and the size of the oyster reef wherein the greatest percentage of the oysters are deposited constitutes approximately 67 to 70 acres.
The questions presented to this court being factual ones, it is incumbent on us to determine whether or not the trial judge committed manifest error in reaching the judgment rendered below.
The record reflects that Dr. Harry Bennett, a defense witness and an expert witness in zoology and biology, made a recommendation *239 that the canal be moved approximately 500 feet to the north and east of the original proposed location thereby bypassing a large portion of the leased area particularly the oyster reefthus minimizing the damage to the oyster beds. Were the canal to be relocated, less silt and sedimentation damage would have resulted. He testified that only about one inch of silt would have been spread on the lease area if the channel had been relocated.
Barney Barrett, a geologist with the Louisiana Wildlife and Fisheries Commission, testified that he examined the lease on December 10, 1963, and that he found mud or silt covering the oysters from three inches to six inches in depth at the northwest part of the lease and from six inches to eight inches of silt at the northeast portion. He testified that the silt gradually reduced in depth as the distance increased from the spoil bank and that the southernmost part of the lease had a silt covering of from one to two inches in depth. His testimony that the canal as dredged was straight indicated that there was no dogleg to the south. This observation indicates that the canal was dug at the original proposed site contrary to the recommendation of Dr. Bennett.
Mr. Friedrichs testified that he examined the oyster lease on October 13, 1963, and that there were approximately 67 acres of hard oyster reef. He recommended, as did Dr. Bennett, that in order to minimize the damage to the oyster bed, the proposed channel should be moved to the north and east. His reason was the same as that of Dr. Bennett. He further stated that were the canal backfilled, it could be used as a productive oyster reef in the future. This also would minimize damages. The record reflects the canal was not backfilled, but on the contrary, the spoil bank, on both sides of the canal, protruded above the surface of the water in various places, and in others, was below the surface, however, perceptibly close to the surface. Mr. Friedrichs did not know in fact where the channel or canal was dug.
Ralph Paratour, employed as an Oil Field Investigator for the Louisiana Wildlife and Fisheries Commission examined the lease on December 10, 1963, in order to ascertain the damage caused to the area as a result of the dredging of the canal. He stated that the canal was straight, that there was no dogleg and that the canal was dug as staked out by the Trahan stakes, indicating that the canal was ultimately dug at the original site, contrary to Mr. Friedrichs and Dr. Bennett's recommendations.
Other witnesses, including Macario Lauzon and Douglas LeBlanc, testified that the canal was dug straight also indicating that there was no dogleg in the canal and that the canal commenced at the original site as designated and was dredged east to the well site. Their testimony, as well as that of plaintiff, showed that there was extensive damage to the bed as a result of the silt and sedimentation from the spoil bank.
Dr. Bennett further testified that his reasons for recommending that the canal be located to the north of the original site were that the current runs north and south and that if a canal were dug from west to east that the currents would be transversed, thus carrying more sedimentation to spread north and south on the reef and causing more damage. However, Dr. Bennett concluded that if the canal were dredged from the north to the southeast across the reef, the canal would run more closely along the path of the current resulting in less spreading of sedimentation and silt from the spoil bank.
Obvious inconsistencies in the testimony of defense witnesses, C. Howard Fenstermaker and T. C. Davis, destroy to a large extent the credibility of both.
After considering all of the testimony of the witnesses as to the direction and path of the canal and in light of the damage resulting from the sedimentation and silt, we *240 are of the opinion that the canal was not dredged in accordance with the opinions of the experts as recommended and that reasonable prudence was not observed by Trahan in minimizing the damage to the oyster lease of the petitioner herein.
The burden is placed upon the mineral lessee to use reasonable prudence in order to minimize damages, and he cannot conduct his operation in disregard of the rights of the oyster lessee. In the case of Doucet v. Texas Co., et al., 205 La. 312, 17 So.2d 340 at 341 (1944), rehearing denied March 13, 1944, the Louisiana Supreme Court discussed the rights of an oyster bed owner whose oysters had been damaged by oil operations:
"* * * the plaintiff had a valuable property right in these oyster beds, for the loss of which he can recover against the one by whose fault the loss was incurred." (Emphasis added.)
The Court further stated at p. 341 of 17 So.2d:
"* * * a careful study of Section 1 of Act No. 258 of 1926 will disclose that it was the legislature's intention to thereby permit the state to grant mineral leases in such beds and bottoms without the necessity of securing the consent of the persons to whom oyster leases were granted. It was never the legislature's intention to give to the mineral lessees the right to operate or conduct their operations in such a manner as to pollute the waters over these beds and bottoms in utter disregard of the rights of the oyster lessees." (Emphasis added.)
In the case of Collins v. Texas Company, 267 F.2d 257 (5th Cir. 1959) the Court discussed the relationship between the Oil Company exercising a mineral lease and the lessee of oyster beds. In referring to the Doucet case, supra, the Court stated:
"* * * That case recognized for Louisiana that there were two valuable natural resources, both owned by the sovereign or its agencies and both of which should be fully exploited. To achieve that required that neither have absolute pre-eminence and that both must be accommodated through the flexible rule of prudence and reason.
* * * * * *
"The case was therefore one requiring proof from which reasonable minds could infer that the Oil Company had done something which a prudent person would not have done, or had done it in a way which a prudent person would not have performed it. * * *" at 260.
The Court in Collins, supra, at 259, 260 addressed itself to the duty each party owes not to unduly damage the other.
"* * * On the contrary, Louisiana considers that mineral lessees and oyster bed lessees each have valuable rights and such coexisting rights subject both to the "rule that every person must so exercise his rights as not to unduly or negligently injure others; * * *." Consequently, the `burden of proof was on the plaintiff to show that his damages * * * were due to negligence on the part of the defendant, or to its disregard of plaintiff's rights under his oyster lease.' Vodopija v. Gulf Refining Co., 5 Cir., 1952, 198 F.2d 344, 345-346." * * *
Though the trial judge did not assign written reasons for his judgment, he was of the obvious opinion that the defendant did not act in a reasonably prudent manner, thus resulting in the judgment placing liability on the defendant company. We find no error, in this regard, by the trial judge.
In connection with damages sustained by the plaintiff, the oyster lessee, the record reflects that Mr. Friedrichs estimated in his testimony that the yield from the oyster lease would approximate $200,000 per year, give or take 25 percent. It is significant, however, that the evidence in the record does not substantiate this testimony concerning the anticipated yield from the other *241 witnesses herein as well as the testimony of the plaintiff.
According to the testimony of the experts and other witnesses, oysters from this area are marketed either by the sack or by the can as steam oysters. Depending on size, the evidence reveals that in 1963 the average net price after cost of harvesting was approximately $2.50 per sack to the oyster lessee. Additionally, the evidence reflected, and particularly the testimony of Maurice G. Hedrick, Jr., that had the oysters been sold by the can, the average price in 1963 would have been approximately 12 cents per can.
It was testified to by Macario Lauzon, the eldest son of the plaintiff, that 25 or 30 boatloads of seed oysters were planted in August and September of 1963 and that a boatload consists of 350 to 400 sacks of oysters. He further testified that there were about 50 cans of oysters to a barrel and three or four sacks to a barrel. There was further evidence that Lauzon had prepared the bed by putting seed oysters and cull in the area as early as 1961 and 1962.
Dr. Bennett testified that Albert Lauzon told him that 22 boatloads of seed oysters were planted and that each boatload carried approximately 350 sacks of oysters. Dr. Bennett testified that there were 7,316 sacks on the lease area and that Albert Lauzon advised him that he had planted 7,700 sacks of oysters. Dr. Bennett further estimated the size of the cultivated reef area at approximately 45 acres in size while the testimony of Mr. Lauzon and other witnesses was to the effect that approximately 70 acres of the 133 acre lease area was cultivated oyster reef area.
Albert Lauzon testified that the yield in 1963 would be 30 or 35 boatloads. He referred to boatloads of 1,000 sacks to 1,500 sacks per boatload. This testimony must be considered in connection with the conflicting testimony of Macario Lauzon as well as other witnesses.
It should be noted that the testimony of Albert Lauzon in his deposition is conflicting and uncertain as to the quantity of oysters per boatload, for the reason that in one part of his deposition he refers to a boatload consisting of 675 sacks, and in another portion of his deposition he refers to approximately 200 to 225 sacks per boatload. From a consideration of the entire record, neither of these figures appears to be accurate. From all of the testimony herein, it appears that boatloads carrying 400 sacks of oysters is most representative of the quantity of oysters per boatload. In connection with the yield, Dr. Bennett testified that a 10 percent allowance should be given for mortality and that a 30 percent yield should be expected.
After considering all of the testimony, much of which was conflicting and contradictory, in connection with the question of the losses incurred the Court is of the opinion that the following formula is applicable.

1. 30 boatloads planted400 sacks
 per boatload - 12,000 sacks
2. 30 percent increase in size - 3,600 sacks
 ______________
TOTAL 15,600 sacks
3. Less 10 percent mortality in one
 year -1,560 sacks
 ______________
BALANCE 14,040 sacks
14,040 sacks @ $2.50 per sack
for one year $35,100

There was evidence to indicate that some of the oysters harvested from the bed could have been sold as steam oysters. In that event the price would be determined by the can. Other testimony indicated that the oysters were to be sold by the sack. Since the biologists, Mr. Friedrichs and Dr. Bennett testified in terms of sack oysters found during the survey of October 13, 1963, and since the record, for the most part, when referring to damages incurred, related to sack oysters, it is necessary to relate plaintiff's alleged loss to sacks as opposed to canned oysters. After having computed the loss for a period of one year, it becomes necessary to ascertain the amount of damages incurred by plaintiff in the nature of continued losses resulting from the damage to the oyster reef. While the evidence reflected that it is reasonable *242 that this particular reef could yield for a period of two additional years, any consideration of continuing damages in excess of a period of one year would, in this Court's opinion, be speculative. Therefore, the Court considers continuing damages only to the extent of one additional year. In view of the testimony of Dr. Friedrichs and others that an average loss from mortality and other factors and variables approximate 25 percent, we are of the opinion that the allowance for continuing damages for the additional year is computed as follows:

1. Value of loss, 1963 - $35,100
2. 25 percent loss ocasioned resulting
 from mortality and other
 variables - 8,775
3. Value of continuing damages,
 1964 - 26,325
Total loss of plaintiff:
1. Losses for the year, 1963 - 35,100
2. Continuing loss for the year,
 1964 - 26,325
 _______
3. Total Loss - $61,425

For the reasons assigned, the judgment appealed from is amended so as to decrease the amount awarded from the sum of $124,880.40 to the sum of $61,425. As thus amended, and in all other respects, the judgment is affirmed; costs of this appeal to be paid by the plaintiff-appellee.
Amended and affirmed.
REDMANN, Judge (dissenting).
I disagree with certain factual conclusions, including the decisive one that defendant did not dredge its canal in accordance with the experts' recommendation.
But even if I err in concluding defendant did follow that recommendation, I disagree that the legal result would be liability for 100% of the oyster destruction.
As I appreciate the law as set forth in Doucet v. Texas Co., 205 La. 312, 17 So.2d 340 (1944), the mineral lessee and oyster lessee enjoy equal dignity and equal right, with a concomitant equal obligation to exercise one's right with due regard for the other's and so as not to unreasonably interfere with the other's right or cause him reasonably avoidable damage. One lessee is not liable to the other for such damage as may result from the reasonable exercise of one's right. Liability results only where one's negligence damages the other.
My point of disagreement is that such liability is limited to the damage that the negligence caused.
In my view the proper measure is the difference between the total loss, where the mineral lessee is negligent, and the loss which would have resulted without negligence.
Assuming (as the majority concluded) the actual canal was 500 feet south of the reasonable location, it appears to me that all the record shows is that following the experts' recommendation to dredge 500 feet north would merely have shifted the whole area of destruction 500 feet north. Since plaintiff's oyster lease had an average depth of about 2500 feet, all of which was destroyed, moving the canal 500 feet north would presumably only have saved, at most, the southernmost 500 feet. Accordingly all that defendant's negligence destroyed was one fifth of plaintiff's oyster bed, and quantum should therefore be at most one fifth of the amount allowed by the majority.
From my view of the factual evidence, however, plaintiff's suit should be entirely dismissed.
The original route of the canal had its beginning with its northern edge at light buoy No. 9. The canal would have entered plaintiff's lease on its western boundary, and the route would have been near to and roughly parallel to the lease's northern boundary.
The experts' recommendation would have moved the canal 500 feet north at its beginning. The route would have been north of the lease's northern boundary until about midway across that boundary, at which point (in order to reach the wellsite *243 near the eastern boundary) the route would have turned and entered the lease at its northern boundary and proceeded straight thereafter to the wellsite.
The State Department of Wild Life and Fisheries ("WL&F") report describes plaintiff's own original complaint as follows:
"Mr. Lauzon stated that a McDermott drag line dredged a channel through the northeastern portion of his lease sometime in October 1963. * * *" (Emphasis added.)
The report, made by WL&F geologist Barney Barrett, also reports his own findings:
"The results of a fathometer run made over the northern portion of the lease indicated a channel 8 to 9 feet below the water line and 60 to 75 feet wide was cut through the northeast section of lease #17395. The channel entered the lease just west of the center of the northern boundary and ran southeast to the well." (Emphasis added.)
Both Barrett and his assistant, Ralph J. Paratour, Jr., testified that Barrett's rough sketch accurately showed the canal entering the northern boundary of plaintiff's lease.
Indeed, it was stipulated between plaintiff and defendant that geologist Barrett's drawing is accurate to the best of his ability (T. 114).
Barrett, asked about the channel's straightness, replied, while looking at his drawing,
"Well, I can't remember. According to this it was pretty well straight. Yes, it was straight."
Macario Lauzon, plaintiff's son, testified the canal started "in the vicinity of that light #9". (On the original plan, the northern edge of the canal was at light #9; the modified plan put the northern edge 500 feet and the southern edge 430 feet north of light #9.) Macario did testify the canal was "straight", speaking of the entire canal. Yet the trial court rejected Macario's testimony about the shape of the oyster reef since Macario said he didn't really know where it went because it was under water!
Douglas LeBlanc, a former employee of plaintiff, testified the canal started "almost right by the light." "Q. Did the canal have any bend or curve in it? A. Not that I saw." On cross, LeBlanc was asked "Q. Are you able to tell the court, with any degree of certainty, how close it was to buoy #9 where it started or, do you know? A. No, I couldn't."
Surveyor Fenstermaker did not check the canal itself to verify that it was laid out in accordance with his modified plan incorporating the experts' recommendation. But engineer Davis, a former employee of defendant, did. The majority rejects their testimony erroneously, in my opinion. But I disregard their testimony and consider only that of Macario Lauzon and LeBlanc, as against that of Barrett and Paratour, together with the original complaint to WL&F by plaintiff.
In my opinion Macario's and LeBlanc's testimony is not positive as to the starting point of the canal. They do not ever contradict the positive testimony of Barrett and Paratour that the canal entered the northern boundary and traversed the northeastern section of the lease, as plaintiff originally complained to WL&F and as shown on geologist Barrett's drawing stipulated to be accurate to the best of his ability.
It is plaintiff's burden to prove every element of its case, including that defendant was negligent in its operation. In my opinion plaintiff did not prove that defendant acted in disregard of the experts' opinion. To the contrary, I believe, the evidence is virtually uncontradicted that defendant did enter the lease at its northern rather than its western boundary and *244 therefore did follow the experts' recommendation.
No negligence being proved by plaintiff, the judgment appealed from should be reversed and plaintiff's suit dismissed.