284 So.2d 173 (1973)
John JURISICH and Frank S. Slavich
v.
LOUISIANA SOUTHERN OIL & GAS CO. et al.
Joseph JURISICH
v.
LOUISIANA SOUTHERN OIL & GAS CO., et al.
No. 4973.
Court of Appeal of Louisiana, Fourth Circuit.
May 31, 1973.
*174 Richard Dowling and Robert Zibilich, New Orleans, for plaintiffs-appellees.
Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, Albert Hanemann, Jr., New Orleans, for defendants-appellants.
*175 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Claude Vasser, New Orleans, for defendants-appellees.
PER CURIAM.
These two consolidated cases involve claims by owners of oyster leases for damages to their oyster beds allegedly caused by negligent dredging operations. In Suit No. 4972 John Jurisich and Frank Slavich sued an oil Company, Louisiana Southern Oil & Gas Co., and its dredging contractor, J. Ray McDermott & Co., for damages caused on two oyster leases, located in Lake Machias in St. Bernard Parish and identified as L-18,002 and L-14,550 on the annexed sketch, which is a composite of several exhibits. McDermott filed a third party demand seeking indemnity from the co-defendant. The trial court rendered a judgment against Louisiana Southern and dismissed McDermott. The oil company appealed, and plaintiffs answered the appeal seeking an increase in the award.
In Suit No. 4973 Joseph Jurisich (John Jurisich's father) sued the same defendants for damages on three leases in the Lake of Second TreesMulatto Bayou area. The trial court found damage on one lease only (identified as L-17,692 on the annexed sketch) and awarded judgment against McDermott, further denying that defendant's third party demand for indemnification. McDermott appealed, and plaintiff answered the appeal seeking an increase in the award.
The dredging operations took place in late October, 1965. The three oyster leases at issue on this appeal were granted by the State of Louisiana as follows:
1. L-14,550, containing 47 acres, dated June 3, 1957.
2. L-17,692, containing 3 acres, dated October 26, 1964.
3. L-18,002, containing 100 acres, dated September 23, 1965.
Louisiana Southern held an oil, gas and mineral lease granted by the State of Louisiana on March 19, 1964, covering the beds and bottoms of all bodies of water in the area, including the water bottoms covered by the oyster leases. The lease was
". . . for the purpose of exploring by any method, including but not limited to, geophysical and geological exploration for formations or structures and prospecting and drilling for, mining and producing sulphur, potash, oil gas and any other liquid or gaseous hydrocarbon minerals, storing minerals and fluids, laying pipe lines, dredging canals, building roads, bridges, docks, tanks, power stations, telephone and electric transmission lines and other structures and facilities, including houses for employees necessary or convenient for the purpose of conducting the aforesaid operations,. . ." (Emphasis supplied)
Louisiana Southern chose the drilling site in Lake Machias indicated by the circled letter "W" on the attached sketch and intended to float a submersible drilling rig to the location. Although the site was accessible by water about three feet deep, the rig required vertical clearance of at least eight feet. Some dredging was therefore necessary before the rig could be floated to the drilling site.
Irion Bordelon, executive vice-president of the company, consulted a geologist who specialized in water bottoms to assist in selecting a route to the location which would require the least amount of dredging while also avoiding or minimizing damage to oyster beds. The geologist plotted the locations of existing oyster leases and visited the area with Bordelon, where they spoke to John Jurisich in July, 1965. The fisherman pointed out advantages of various routes (which would largely avoid his father's leases) and agreed to meet with them, but heard nothing further until the dredging began on October 19, 1965.
Bordelon and the geologist testified that they selected, as the most reasonable under *176 the circumstances, a route beginning at an existing canal to the northeast, going through Mulatto Bayou into the eastern end of Lake of Second Trees, then south through a cut known as Jurisich Bayou into Lake Machias.[1] On this route it was necessary to dredge across or near each lease involved in this litigation.
As to the process of route selection, Bordelon testified that they considered two alternatives. Use of the first alternative route, across Lake Machias from the south, which was almost entirely covered by oyster leases, would have produced "unreal" oyster damages both from dredging and from silting, since there were no banks on which to deposit the spoil. A second alternative route to the east of the selected route was across two canals from Mulatto Bayou to the cut into Lake Machias. Bordelon testified that the water was extremely shallow and that the owners of the adjoining land claimed the entire area as land susceptible of private ownership rather than navigable waters under the dominion of the State. Therefore, since the legal status was uncertain and the parties who claimed ownership of these shallow water areas prohibited dredging, Bordelon decided against this second alternative route.
When the selection was completed, Bordelon employed a surveyor to plot the selected route. The survey showed the route adjacent to the banks, with the notation "All spoil to be distributed on the bank" and with oblong markings indicating the bank on which the spoil was to be deposited. Bordelon then employed a dredging contractor to dredge the channel along the surveyed route.
Louisiana Southern contends that the duty owed by a mineral lessee to an oyster lessee of coextensive property is to exercise its rights under the mineral lease so as not to negligently or unduly cause damage to others. Inasmuch as some dredging across oyster beds was required in order to float the rig to the drilling site by any route, Louisiana Southern contends that it fulfilled any duty it owed to the oyster lessees in the area by selecting a route which encountered the fewest existing oyster leases, by having the route surveyed, and by employing a reputable dredging contractor to dredge along this route. Essentially, the company argues that while it damaged some oyster beds, it was not liable to the oyster lessees unless it breached its obligation to minimize damages by conducting its operations prudently and cautiously.
Since we conclude from the evidence that some damage was caused by negligence and some damage resulted from activities prudently conducted with proper precautions, we must initially face the issue of whether the enterpriser is responsible for damages which result from its non-negligent activities. If so, then it would not be necessary to distinguish negligent from non-negligent damages. The court would simply measure and assess total damages.
The Supreme Court considered the rights and duties of the respective owners of coexisting oyster and mineral leases in Doucet v. Texas Co., 205 La. 312, 17 So.2d 340 (1944). That case has been cited in almost every subsequent Federal and State case in which this conflict of interest has arisen.
In Doucet the plaintiff oyster lessee complained that the mineral lessee had in the course of its oil operations negligently discharged large quantities of pollutants into Lake Barre and Lake Pelto, which resulted in the pollution of these lakes and the surrounding bodies of water and the death of plaintiff's oysters in these waters. As to defendants' exception of no cause of action based on the contention that plaintiff did not possess any right of ownership in the oysters when they were killed, the court held that plaintiff by virtue of the *177 lease granted under Act No. 258 of 1926[2] had a valuable property right in these oyster beds and could recover his losses "against the one by whose fault the loss was incurred." (Emphasis supplied)
As to defendants' alternative contention on the exception that the injury was "damnum absque injuria" since the oil operations were conducted under a mineral lease which Act No. 258 reserved in the State the right to grant, the court stated:
"* * * it was the legislature's intention to thereby permit the state to grant mineral leases in such beds and bottoms without the necessity of securing the consent of the persons to whom oyster leases were granted. It was never the legislature's intention to give to the mineral lessees the right to operate or conduct their operations in such a manner as to pollute the waters over these beds and bottoms in utter disregard of the rights of the oyster lessees." (P. 341)
The court then turned to the merits of the case and discussed at length the voluminous evidence. Concluding that "the preponderance of the evidence shows that the pollution of the waters with oil and other effluents discharged into them by the defendant company was the proximate cause of the mortality of plaintiff's oysters," the court affirmed a judgment in favor of plaintiff.
Commenting on the case in VI Louisiana Law Review 204, (1945), Professor Wex S. Malone stated:
"The issue of the wrongfulness of the defendant's conduct was dealt with more sparingly than the other questions of the controversy. The court was satisfied that some of the oil escaped through carelessness on the part of the pumper or gauger, and that leaks developed in the pipes. One might conjecture whether such a case as this really rests upon negligence, or whether the trespassory nature of the invasion, or theories of nuisance, might not be employed if necessary so as to impose an insurer's responsibility." (P. 213)
Several Federal cases have subsequently observed the law is "well settled" that the oyster lessee must prove negligence and lack of due care on the part of the mineral lessee in the exercise of its rights under the lease and that unless there is a showing of negligence, there can be no recovery.[3] However, we have found no Louisiana appellate court decision which has made this specific holding, since the reported cases which we have examined have either found that negligence was proved on the part of the mineral lessee or that no damages were suffered by the oyster lessee.
In Skansi v. Humble Oil & Refining Co., 176 So.2d 236 (La.App. 4th Cir. 1965) the court concluded that "plaintiff's oysters were contaminated by oil from defendant's well, and that this would not have occurred except for some fault or negligence on defendant's part." (Emphasis supplied)
In Trosclair v. Superior Oil Co., 219 So.2d 278 (La.App. 1st Cir. 1969) the court found there was no oily taste in the oyster within a month or two of the incident complained of. (In dicta, the court cited several Federal cases for the proposition that the oyster lease was subject and subordinated to the prior recorded mineral lease.)
In Lauzon v. J. C. Trahan Drilling Contractor, Inc., 247 So.2d 236 (La.App. 4th Cir. 1971), the only other case involving dredging operations preparatory to the *178 actual drilling, separate experts employed by both the mineral lessee and the oyster lessee agreed on a recommended dredging route, which was determined after considerable research and inspection of the oyster reefs and beds located within the area of the oyster leases. After the experts agreed on a route which would avoid as much as possible the sections within the leases where oyster beds were actually located, plaintiff contended that the mineral lessee did not follow the recommended route. The majority agreed with this contention and on the basis of that negligence affirmed the trial court judgment in favor of the plaintiff.
The dissenting judge disagreed with this factual finding and suggested that the plaintiff should not recover any damages caused by the dredging as long as the defendant actually followed the route reasonably calculated to cause minimum damage.
Faced squarely with the issue for the first time, we hold that a mineral lessee is not liable to an oyster lessee of coextensive property for damages resulting from necessary and prudent activities incident to the mineral lease, when the activities are conducted with reasonable skill and with proper precautions.[4]
The mineral lessee owes no greater duty to the oyster lessee than it owes to the lessor, the State of Louisiana (notwithstanding that the oyster lease may have been the first effective, since the oyster lease reserved the right to grant a mineral lease). The mineral lease granted by the State gave the lessee the right to explore the leased property for oil and gas and to dredge canals in connection with this exploration. In granting this lease, the State impliedly consented in advance (as authorized by its reservation of mineral leasing in the oyster lease) to the damages which foreseeably and necessarily resulted from prudent and cautious activities of the mineral lessee in exercising its rights under the lease. When the mineral lessee thereafter, while exercising reasonable prudence, caused damage to oyster beds in dredging activities necessary to the exploration for oil and gas, no cause of action for these damages accrued in favor of either the State or its oyster lessee.
Using the principles outlined above, we now proceed to examine the cause and extent of the damage to the oyster leases and to determine the liability of the defendants therefor.
Suit No. 4973 involved Lease L-17,692, a three acre reef located in the eastern portion of the Lake of Second Trees. The route outlined on the survey furnished by Louisiana Southern to McDermott did not cross this lease. However, the dredge operator substantially deviated from the route and followed a deep water channel from Mulatto Bayou into this area and then commenced dredging in open water, away from the shore line. This deviation saved dredging costs, but necessitated depositing spoil in open water rather than on the bank. The silt from this spoil, according to John Jurisich, covered the reef and smothered and killed the oysters.
The damage to this oyster reef was unnecessary and would not have occurred if the dredge operator had followed instructions. Although the actual route appeared on the surface to be reasonable in the absence of instructions, the survey which the dredge operator admitted was given to him not only showed a route adjacent to the bank, but expressly required the deposit of spoil on the bank. Accordingly, we find no manifest error in the trial judge's determination that the negligence of McDermott's dredge operator caused the damage to this reef.
Alternatively, McDermott contends that the dredge employees were borrowed *179 servants of Louisiana Southern during the dredging operations, since McDermott simply agreed to rent a dredge and crew to Louisiana Southern at an hourly rate. McDermott argues that Louisiana Southern exercised almost complete control over the dredging operation, or should have done so under the agreement.
To determine whether an operator furnished with leased machinery is the employee of the lessee or the lessor at the pertinent time, the Supreme Court in Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951) stated:
"To determine whether a given case falls within the one class or the other we must inquire whose is the work being performeda question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." (P. 141)
Citing the same language in B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 (1955), the Supreme Court concluded:
"The test upon which all eventually turn * * * (is) who controls the servant in the named employment." (P. 372)
The record in the present case fails to support McDermott's contention that the dredge operator was a borrowed employee. Louisiana Southern furnished the route to be dredged, but this is more a matter of contract specification rather than an element of control. In this limited manner Louisiana Southern exercised control over the dredge operator by exercising control over the contracting firm itself.[5] But Louisiana Southern did not exercise any substantial control over the contractor's employees or over the method of dredging the canal along the selected route. After the dredging commenced, Louisiana Southern's representative briefly visited the dredge only twice, the second visit occurring after the dredge was considerably past the area of L-17,692. We conclude that McDermott failed to establish that Louisiana Southern either exercised control or had the obligation to exercise control over the employee who caused the damage.
Finally, McDermott reurges its third party demand for indemnity on the basis that Louisiana Southern agreed to hold McDermott blameless for damage to oyster beds caused by the dredging, as confirmed by the following language in McDermott's letter to Louisiana Southern:
"It is further agreed that J. Ray McDermott & Co., Inc. will not be held responsible for any damaged oyster bed claims resulting from the performance of this work."
Indemnity agreements must be strictly construed, especially when a party seeks to be indemnified for liability for damage caused by its own negligence. Arnold v. Stupp Corporation, 205 So.2d 797 (La.App. 1st Cir. 1968). The proof in this case, viewed most favorably to McDermott, establishes only that Louisiana Southern agreed to indemnify McDermott for damages *180 caused by prudent and cautious dredging. There is no proof whatsoever that Louisiana Southern agreed to indemnify McDermott for liability for damage caused by McDermott's negligence. The third party petition was properly dismissed.
The trial court awarded damages to Joseph Jurisich for the loss of 1,200 sacks of oysters at $3.00 per sack, or $3,600.00, and for the loss of a three acre lease at $500.00 per acre, or $1,500.00.
As to permanent damage, the reef was neither dredged over nor was spoil deposited directly on it. A marine biologist employed by Louisiana Southern examined the area in June, 1967 and found the reef contained oysters alive and usable. John Jurisich admitted that after allowing the silt to settle, he bedded additional oysters but had not attempted to harvest any. The entire evidence thus indicates that the reef was not permanently damaged. There is therefore no basis in the record for the $1,500.00 award, and it must be reversed.
Joseph Jurisich is entitled, however, to recover for the loss of the oysters which were killed by being silted over. It is very difficult to determine the amount of oysters harvested from any particular area, since the fishermen do not keep a record of the area from which each load is harvested. Rather, they harvest alternatively from various areas, depending upon the tides and other considerations. The estimates of oysters harvested from this high shell reef ranged from 2,000 to 3,000 sacks every two years; John Jurisich estimated there were 2,000 to 2,500 sacks ready to be harvested at the time of the damage. However, there was other testimony that silting only kills the oysters at the bottom, which are smothered by the mud overlay, and that this was a high reef. Under the evidence in this case, we find no manifest error in the factual determination by the trial judge that John Jurisich sustained the loss of 1,200 sacks of oysters because of the dredging operations. However, the preponderance of the evidence established that oyster fishermen netted above expenses approximately $2.50 per sack at the time of the damage, and the award of 1,200 sacks at $3.00 per sack must accordingly be reduced from $3,600.00 to $3,000.00.
As to L-18,002 and L-14,550 in Suit No. 4972, it was necessary in following the route selected by Louisiana Southern to dredge a canal, 60 feet in width, completely across L-18,002. The well site was located approximately on the northern border of L-14,550. The slip surrounding the well location, measuring approximately 350 feet by 150 feet, apparently occupied portions of both leases.
In 1963 the geologist subsequently employed by Louisiana Southern had examined L-14,550 for other purposes and had determined the extent of the natural reef, which constituted 50% to 60% of the lease. He then valued the water bottoms in this lease at $500.00 per acre. He had not examined L-18,003, as that lease had not yet come into existence.
In assessing the damages caused by the dredging, the geologist evaluated (1) the beds which were permanently damaged by being dredged for the canal or slip or by being covered with the spoil bank, and (2) the existing oysters which were killed either by direct dredging or by silting. He calculated that approximately five acres of water bottom had been permanently damaged by the canal and the well slip in the two leases and valued these bottoms, mostly located in L-18,003, at $300.00 per acre. He also noted the loss of the existing oysters within the area of direct dredging.
As to damages caused by silting, the geologist found that oyster mortality two months after the dredging was generally limited to those areas just outside the dredged area and that only a minor amount of silting occurred beyond the area of the canal. In Lake Machias, where there was no bank adjacent to the dredging route, spoil was deposited on both sides of the dredged canal and around the perimeter of the well slip. The geologist estimated that *181 42 acres had been affected by the silting, which caused an oyster mortality of approximately 10% above the normal rate, but that the south half of L-14,550 had not been affected. Assigning an average yield of 400 sacks per acre, he calculated that the abnormal mortality in the 42 acres resulted in a loss due to the silting of 1,680 sacks from the current crop of oysters.[6] However, he did not consider this area to be permanently damaged.
Another geologist from the Department of Wildlife and Fisheries examined the area on October 28, 1965 and February 3, 1966. In L-18,003 his examination revealed numerous bleached oyster shells in the spoil banks; no oysters on the western side of the lease "because of the dredged channel, spoil banks in the water, and overburden of mud"; and low mortality of oysters on the eastern side of the entrance to the bayou, in which area the oysters exhibited no mud stains.
In L-14,550 his examination revealed a thick layer of soupy mud in the area surrounding the well location and a spotty mud overburden on the remainder of the lease, with oyster mortality gradually decreasing southward.
He concluded that the dredging caused the loss of many oysters and natural and man-made reefs and that silting resulted in the death of many existing oysters. He estimated that 46 acres of oyster bottoms had been damaged in L-18,002 and that the bottoms were destroyed within an 80 foot radius of the well slip. He found oyster mortality high in L-14,550 and estimated that 37% of the oysters had been killed on the lease outside the dredged area.
The marine biologist examined the area in June, 1967 and found L-14,550 "to be in excellent condition, with good oysters present and no mortality of any significance." He considered the lease to be a large natural oyster reef, capable of good oyster production.[7]
In L-18,002 he found a firm bottom and some oysters present in the eastern half. In the western half, outside the dredged area, he found no oysters and no sign that oystering had ever been carried on. He opined that the bottom was too soft for oyster production, except at the west end of the lease.
As to these two leases, the trial court awarded damages for the loss of 4,800 sacks of oysters at $3.00 per sack, or $14,400.00. and for the loss of a 20 acre lease at $500.00 per acre, or $10,000.00.
As previously stated, plaintiffs are only entitled to recovery for the damage to their oyster bed which was caused unnecessarily or negligently.
In preparing for dredging, Louisiana Southern's geologist plotted the location of existing oyster leases and outlined the lease boundaries, but he did not establish the location of the reefs and oyster beds within the leases. If it had been possible to plan a route so as to reasonably avoid the natural reefs, perhaps permanent damage to reefs directly within the actual route could have been avoided or minimized.
However, plaintiffs have the burden of proving that Louisiana Southern did not utilize reasonable methods of minimizing damages. The record in this case shows that when the dredge entered L-18,003, it followed the north shore line of Lake Machias as far as possible before moving into open water to reach the well *182 site. Plaintiffs have failed to prove that another route across L-18,003 would have been more prudent and would have caused less direct damage, or that it was not necessary to cross the oyster reefs which were crossed. Accordingly, plaintiffs have failed to prove that any direct damage to the reefs and beds by the dredging resulted from Louisiana Southern's failure to utilize reasonable steps to minimize or avoid damages.[8] Hence, the award of the trial court for permanent damage to 20 acres of water bottoms must be reversed.
As to damage to the existing oysters on and outside the dredging route, Louisiana Southern was negligent in failing to notify plaintiffs before the dredging commenced of the route selected. Had plaintiffs been so notified, the oysters in or near the direct path of the dredging could have been harvested and those not ready for harvesting could have been moved to another location. Louisiana Southern's failure to notify plaintiffs deprived them of the opportunity to salvage these oysters and to minimize their losses. Thus plaintiffs are entitled to recover the "in place" value of the oysters which could have been harvested or moved.[9]
The oysters on at least five acres were completely destroyed, and those on numerous additional acres sustained increased mortality in varying degrees, depending on the proximity to the dredging. Louisiana Southern's geologist estimated (using a yield of 400 sacks per acre) that 2,000 sacks were lost on the five acres dredged and an additional 1,680 sacks were lost from the abnormal mortality sustained on 42 acres. The estimate by the other geologist was considerably higher, although percentages were not assigned in all areas.[10] His total would have greatly exceeded the 4,800 sacks awarded by the trial judge.
We therefore conclude that the trial judge did not commit manifest error in determining as a fact that plaintiffs lost 4,800 sacks of oysters as a result of Louisiana Southern's negligence. However, this award must be decreased to reflect the value per sack of $2.50, or a total of $12,000.00.
Accordingly, the judgment of the trial court is amended to reduce the amount of the judgment to $12,000.00, and as amended, the judgment is affirmed. Defendants are cast with all costs in equal proportions.
Amended and affirmed.
*183 
*184 LEMMON, Judge (dissenting in part).
I disagree that the oyster lessee cannot recover damages caused willfully, though non-negligently, by the mineral lessee, in the absence of an agreement expressly relieving the mineral lessee of liability for those damages.
The mineral lease in this case expressly granted Louisiana Southern the right to dredge canals in connection with its oil exploration. In my opinion the State thereby consented in advance only to reasonable, necessary and skillful dredging and to those changes on the leased premises normally incident to those dredging activities. The phrase "dredging canals" normally denotes the removal of earth, the creation of enlargement of a cavity, and the placement of excavated soil on a spoil bank in proximity to the canal. I do not believe that it is reasonable to infer when a lessor grants the right of "dredging canals" that he thereby consents to any other changes on the leased property or to the damage or destruction of valuable assets, such as oyster beds. These changes and damages are no more normally incident to the dredging of a canal than would be the destruction of crops, buildings or other valuable assets on the leased property.
Therefore, when Louisiana Southern, through its contractor caused damage to the oyster beds within the leased area, a cause of action for recovery of the damage arose in favor of the lessor or its oyster lessee, regardless of the presence or absence of negligence.
Certainly, Louisiana Southern and the State by contract could have agreed that the lessee would not be liable for any damage to oyster beds caused by prudent and skillful activities which were reasonably necessary in the exploration operations. Perhaps such an agreement would also have been effective as to any oyster leases subsequently granted by the State on the same property. But in this case no such agreement was reached; the lessor simply granted the right to dredge canals.
I would therefore hold that Louisiana Southern is liable for all damages to the oyster beds resulting from the dredging activities.
MANN, C. J., and LILES and McNULTY, JJ., concur.
NOTES
[1] The selected route, as well as the route actually dredged, are shown on the annexed sketch.
[2] Replaced by Act No. 67 of 1932, now R.S. 56:421.
[3] Collins v. Texas Company, 5 Cir., 267 F.2d 257; Vodopija v. Gulf Refining Co., 5 Cir., 198 F.2d 344; Collette v. Marine Exploration Company, D.C., 213 F.Supp. 609; Begovich, Gonzales & Plaisance v. Texas Company, D.C., 209 F.Supp. 412; Vodopija v. Tennessee Gas Transmission Company, D.C., 152 F.Supp. 14. In each of these cases the claim of the oyster lessee was dismissed for failure to prove negligence on the part of the mineral lessee.
[4] Lemmon, J., notes his dissent from this part of the decision and assigns reasons in a separate opinion.
[5] In Benoit v. Hunt Tool Co., supra, the Supreme Court quoted the following pertinent language:

"Of course in such cases the party who employs the contractor indicates the work to be done and in that sense controls the servant, as he would control the contractor if he were present. But the person who receives such orders is not subject to the general orders of the party who gives them. He does his own business in his own way, and the orders which he receives simply point out to him the work which he or his master has undertaken to do. There is not that degree of intimacy and generality in the subjection of one to the other which is necessary in order to identify the two and to make the employer liable under the fiction that the act of the employed is his act." (P. 142 of 53 So.2d)
[6] 42 acres × 400 sacks = 16,800 sacks yielded on 42 acres; 10% abnormal mortality caused by silting = 1,680 sacks lost.
[7] Plaintiff Frank Slavich admitted that most of L-14,550 was not permanently damaged and at the time of trial was "coming back good."
[8] Plaintiffs attempted to prove that use of a more expensive suction dredge rather than the bucket dredge actually used would have prevented much of the damage. However, the main advantage of keeping spoil on the bank and out of the water was not shown to be applicable to L-18,003 and L-14,550, which are located in Lake Machias.
[9] There was no evidence whatsoever as to the amount of oysters which could have been moved or as to the "in place" value of those oysters.
[10] As stated in F. Mansfield and Sons Company v. United States, 94 Ct.Cl. 397, 420-421:

"It is impossible to satisfactorily calculate with any definite exactitude the amount of mud deposited on the lots, the number of lots actually affected in whole or in part, the number of oysters destroyed, and the number which could have been removed in mitigation of damages. * * *
The amount of damage cannot be determined with any degree of accuracy and finality. Even the values vary. However, neither the fact that damages are difficult to ascertain nor that they cannot be calculated with mathematical accuracy constitutes a bar to recovery.
"All that is required is the allowance of such damage as, in the judgment of fair men, directly and naturally resulted from the injury sustained." (Citations omitted)