LEMMON, Judge.
This is an action by an oyster fisherman to recover damages to his leased oyster beds caused by petroleum pollution in the area. In plaintiff’s appeal seeking an increase in the $7,500.00 award, the principal issue is the method of measuring the damages. Facts
In his 20 years in the oyster business plaintiff had obtained a considerable number of leases of water bottoms for the purpose of seeding and harvesting oysters. He generally planted seed oysters in September and October, selecting the best areas from among his leases on the basis of judgment, experience and current conditions, and he harvested mature, marketable oysters between 6 and 24 months after bedding, depending among other things upon the size and source of the seed oysters and the conditions in the bedding area. Plaintiff generally harvested mature oysters from January through June, although in some years harvesting began earlier or lasted later.
One of plaintiff’s best areas for production was on leased property in Bayou Grand Cheniere, where the pollution at issue occurred from three oil spills in 1974. Each year between 1969 and 1973 plaintiff. had planted a considerable number of seed oysters in that area, except in 1970 when at normal seeding time the leased area was occupied by oysters which had been planted as small oysters in 1969 and were not yet of marketable size in the spring and summer of 1970.
Because seed oysters were scarce in 1973, plaintiff planted only 10,890 sacks, about half the amount he had planted in each of the four previous years. However, he planted 6,540 sacks on the leased property in Bayou Grand Cheniere, and he planned to harvest there the following spring or summer, as he had in previous years.[1]
In April, 1974 plaintiff began harvesting oysters in Bayou Grand Cheniere and had fished 3,848 sacks by June 24, at which time his customers complained that the oysters had an oily taste. He discontinued operations there, notifying the Department of Wildlife and Fisheries of the problem. An agent from the Department discovered evidence of an oil spill and confirmed the oily taste of the oysters, noting they were then of marketable size with low mortality.
Oysters eventually purge themselves of an oily taste, but because of two additional spills, the oysters on plaintiff’s lease did not return to normal until April, 1975. Plaintiff then resumed harvesting in the area, taking 7,610 sacks there in addition to the 3,848 sacks he had already fished there. However, because he had been unable to complete harvesting on that property in June, 1974 and to reseed that fall, he lost a *967 year’s production on the Bayou Grand Che-niere property, and that loss forms the primary basis of his claim in this litigation.[2]
The trial court awarded $7,500.00, noting that the measure of damages is “the delay in obtaining the price of the crop” which was ultimately harvested and sold. The Commissioner’s report noted the award was based on inconvenience, interruption of business, and time lost in supervising the situation, as well as the delay in harvesting.

Measure of Damages

The trial court’s approach to damages, based merely on a delay in harvesting the oysters bedded in 1973, is an oversimplification of a complex measurement problem which involves the consideration of numerous factors.
If the oysters had been destroyed, the measure of damages (assuming no permanent damage to the leased property) would simply have been the value of harvested oysters, minus the cost of producing them, as in the case of damage to crops. McCormick, Damages, Ch. 20, p. 486 (1935). The complicating factor that the oysters were not destroyed, but were ultimately harvested and sold, does not justify a conclusion that plaintiff’s only damages were delay and inconvenience.
This case is more properly viewed as one of damage to property rather than one of damage to crops. The leased property in Bayou Grand Cheniere, which was a profit producing asset, was temporarily damaged by defendants’ torts, and plaintiff’s damages should be measured by the cost of restoring the property and the value of the loss of use of the property during the period of repair.
There was no expense in restoring the property to its former condition, since the property was restored by the oysters’ purging themselves of the oily taste. However, plaintiff did suffer the loss of use of the leased property for the period of approximately one year that it took for the property to be restored to its former condition, and the value of this loss of use is his, proper measure of damages.

Calculation of Damages

Determination of the value of plaintiff’s loss of use is far from simple.
Plaintiff had used the leased property constantly since at least 1969, and in every year except one the property produced profits. This record fact is a preliminary indication that, more probably than not, the leased property would have produced profits in 1974 and plaintiff in that year would have reseeded the property for harvesting in 1975, if the property had not been damaged by defendants’ torts.
Defendants argue, however, that when plaintiff was unable to harvest and reseed the leased property in 1974, he either used or should have used the time he would have spent harvesting there to plant seed oysters in other areas in order to minimize his loss. The modest judgment of the trial court reflects acceptance of this theory, since plaintiff’s “failure to seek other oyster beds” is specifically mentioned in the Commissioner’s report.
Defendants’ theory of credit for income which was or could have been produced from other property leased by plaintiff must be considered in light of many factors.
This suit was not one for loss of plaintiff’s personal capacity to produce income, but one for loss of use of income producing property. Defendants’ theory views plaintiff’s loss as if it were a partial loss of earning ability, such as that caused by bodily injury, for example, to a plumber. Thus, an injured plumber, who generally earned $500.00 per week, but who earned only $200.00 per week as a telephone solicitor during six weeks he was disabled to work as a plumber by a tort injury to his person, arguably may recover only $300.00 per week for six weeks, or $1,800.00 in loss of earning capacity, although he would have *968 earned $3,000.00 as a plumber during that period, since the tort caused only a partial disability to produce income.
The rationale differs in cases of damage to property. For example, if a person in the real estate rental business owned an apartment building which generally produced $500.00 per week in rental income and the building was damaged by a tort which resulted in the loss of six weeks of rental income, and if the owner began using another building to produce $200.00 per week rental income during this six-week period, the owner should be entitled to recover $3,000.00 from the tortfeasor for loss of use of his asset, although he received additional rental income of $1,200.00 during that period from an asset which had not produced income for him prior to the tort, unless the tortfeasor can prove it was unlikely both assets, if available, would have produced rental income during this period.
Defendant’s argument on plaintiff’s use of other leased property in his business is perhaps relevant to the question of whether the Bayou Grand Cheniere property more probably than not would have produced profit over the period it was unfit for its regular use. However, the mere fact that plaintiff received other income from other undamaged income-producing property during the period of non-use does not in and of itself relieve the tortfeasors from paying plaintiff’s full loss of use of the asset they damaged, unless it appears that both properties, if undamaged, more likely than not would not have produced profits during this period.
Nothing in this record suggests that plaintiff could not have harvested and reseeded the leased property in Bayou Grand Cheniere in 1974, in addition to the harvesting and bedding that he conducted on other leased property in 1974 and 1975.[3] Indeed, while 1974 was the only year between 1969 and 1976 that plaintiff bedded seed oysters in months other than September and October, most of the additional bedding in 1974 occurred in January, February, March and May, before the first of the three oil spills in June. Furthermore, the additional bedding in the winter and spring of 1974 is explained by the scarcity of seed oysters in 1973.
On this record it is more probable than not that plaintiff would have harvested and reseeded the Bayou Grand Cheniere property in 1974, and since he undoubtedly was prevented from doing so by defendants’ torts, he is entitled to recover the reasonable net value of a year of production on that leased property.
The estimation of the amount of oysters plaintiff would have harvested and would have reseeded in 1974 on the leased property in Bayou Grand Cheniere is somewhat arbitrary. Plaintiff had planted 6,540 sacks of seed oysters in Bayou Grand Cheniere in 1973, and 750 additional sacks were left unharvested there from 1972 because they were too small. He fished 3,848 sacks there in 1974 and 7,610 in 1975, a total of 11,458 sacks harvested on 7,290 sacks seeded, which is a ratio of return of 1.57 sacks of oysters harvested for each sack of seed oysters planted.[4] Plaintiff conceded in testi *969 mony, however, that the extra year of growing time may have produced a greater yield.
Considering the expert testimony, the bedding records for all leases, and the fact that the leased property in Bayou Grand Cheniere was the most consistently productive, we conclude that a return ratio for this property of 1.1:1 is adequately established.
On the basis that plaintiff bedded an average of almost 4,300 sacks per year on the Bayou Grand Cheniere property from 1969 through 1975 and that the return ratio for that property in that area of time is 1.1:1, it may be reasonably estimated that a one-year crop from that leased property would be approximately 4,730 sacks.
The price plaintiff obtained for oysters in 1974 was $6.00 to $6.50 per sack. His operating costs and depreciation of equipment for the last calendar year of complete harvesting and seeding prior to the oil spills amounted to $2.16 per sack. If his net profit per sack was $4.09 ($6.25 minus $2.16), and if he lost 4,730 sacks because of damage to the leased property, his damages for loss of use would amount to about $19,-350.00.

Cause of the Damages

As an alternative argument against an increase in the award, defendants assert that plaintiff failed to prove the three oil spills resulted from negligence, as required by the court in Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173 (La.App. 4th Cir. 1973). In a situation in which an oyster lessee and a mineral lessee had leased coextensive property, a divided court in the Jurisich case held that the mineral lessee was not liable “for damages resulting from necessary and prudent activities incidental to the mineral lease, when the activities are conducted with reasonable skill and with proper precautions”. In the present case the absence of evidence that defendants’ mineral lease covered the property under lease to plaintiff makes the Jurisieh holding inapplicable, and it is unnecessary to consider whether the oil spills may properly be characterized as “necessary and prudent activities incidental to the mineral lease”.
Accordingly, the judgment of the trial court is amended to increase the amount of the award to $19,350.00. As amended, the judgment is affirmed.

AMENDED AND AFFIRMED.

. Plaintiffs bedding records (shown in barrels, but here converted to sacks) for the pertinent years were as follows:
Bayou Grand Cheniere Total — All Leases
1969 4,140 18,480
1970 None 34,710
Bavou Grand Cheniere Total — All Leases
1971 2,475 20,175
1972 4,875 20,775
1973 6,540 10,890
1974 None 26,190
1975 3,540 12,105

. Plaintiff also asserted that after the oil spills he had no other marketable oysters to fish in June, 1974 and began harvesting prematurely in Bayou Chaland, losing an estimated 35 to 40% of the oysters. However, plaintiffs proof of this portion of the claim is inadequate to support a judgment.

. The critical factor is how much the overall operation of the oyster business is limited by plaintiffs own labor. If the overall operation consisted almost entirely of plaintiff’s own labor, and if he had other leased property available on which to conduct the operation, then arguably his loss was the difference in production ability between the damaged property and the other leased property on which he substituted his labor. However, this operation consisted to a substantial degree of investment of capital and employment of the labor of others, in addition to plaintiffs own labor, and the question of whether the damaged property and other leased property could have been put into production at the same time is not determined solely by the limits of plaintiffs own labor.

. Plaintiff testified that on the leased property in Bayou Grand Cheniere he expected to harvest five sacks of oysters for every three sacks of seed (a ratio of 1.66:1). An expert biologist testified that a satisfactory return ratio of oysters harvested to oysters seeded was 1:1, although under excellent conditions 1.2:1 may be achieved.
While plaintiffs production records did not indicate the area in which oysters were harvested, and while some seed oysters take longer to reach marketable size than others, plain *969 tiff’s records of overall bedding in one year and overall harvesting in the following year have some probative value. The records, calculated in sacks, show
Seeding Harvesting
1970 - 11,570 1971 - 8,119
1971 - 20,175 1972 - 13,627
Seeding Harvesting
1972 - 20,775 1973 - 21,053
1973 - 10,890 1974 - 9,571
1974 - 26,190 1975 - 22,178
The average ratio of return for these years on all leases is 0.82 sacks of oysters harvested for each sack of seed oysters planted.