387 So.2d 633 (1980)
Annie Laura VOISIN
v.
BERRY BROS., INC. and Texaco, Inc.
No. 13340.
Court of Appeal of Louisiana, First Circuit.
June 9, 1980.
*634 Keith M. Whipple, and Jules D. Boquet, Houma, for plaintiff and appellant.
John D. Fitzmorris, New Orleans, for defendants and appellants.
Before EDWARDS, LEAR and WATKINS, JJ.
WATKINS, Judge.
This is an action to recover damages for the destruction of oysters on an oyster lease owned by plaintiff, Annie Laura Voisin. These damages are alleged to result from the dredging by Berry Bros., Inc. and Texaco, Inc. of an oil field canal across marsh land and water bottoms located on Texaco, Inc.'s mineral lease. The trial court awarded damages in the amount of $149,500 and costs. We amend and affirm.
By instrument dated February 1, 1946, the State of Louisiana granted to Union Oil Company of California a mineral lease on approximately 4,920 acres of land and water bottoms in Terrebonne Parish, which all parties agree included the oyster lease bottoms in question. Union Oil assigned an undivided one-half interest in this lease to Texaco, Inc. on September 28, 1950. Henry Cenac owned four separate oyster leases on some of these coastal lands and water bottoms.[1] He sold these leases to Mrs. Voisin in 1976. Mrs. Voisin acquired additional oyster reefs, and the entire acreage in the four leases sold by Cenac and in the reefs acquired by Mrs. Voisin was included in a new oyster lease from the State of Louisiana to Mrs. Voisin under instrument dated December 16, 1976.
The oyster reefs included in the oyster lease produced quite well until Texaco dredged, through Berry Bros., a canal across land and water bottoms to provide access to two abandoned wells that it owned on water bottoms for the purpose of removing its equipment. The Berry Bros.' dredge was of a bucket type and deposited spoil the entire length of its dredging operation. Plaintiff contends that the spoil and silt generated from the spoil entirely destroyed the oysters and oyster reefs in her oyster lease.
Four principal issues are presented on appeal: (1) whether or not Texaco must be shown to have been negligent, (2) if so, whether or not Texaco was negligent, (3) causation and (4) quantum.

NECESSITY OF PROVING NEGLIGENCE
Texaco contends that it must be shown to have been negligent in order for the oyster lessee to recover damages, as it dredged the canal as mineral lessee under the state mineral *635 lease. Mrs. Voisin contends, as was held by the trial court, that Texaco was a mere trespasser, and it is strictly liable without proof of negligence, because Texaco did not prove that its state mineral lease was still in effect on the dates of the dredging operations. Mrs. Voisin further contends that the burden of proof is on the mineral lessee, Texaco, to show both the fact that the lease was granted and the fact that the lease has remained in effect. Our reading of the mineral lease renders it unnecessary to decide upon these issues.
The fourth paragraph of the state mineral lease, captioned State Lease No. 725, reads as follows:
"NOW, THEREFORE, BE IT KNOWN AND REMEMBERED, that the said STATE MINERAL BOARD, acting under the authority of the said Act No. 93 of the Regular Session of 1936, as amended, and in accordance with the terms thereof, and acting in behalf of the State of Louisiana as `lessor', does hereby let and lease unto the said lessee, (its) heirs and assigns, the hereinafter described property, for the purpose of exploiting the same by geophysical means in locating mineral bearing structure thereon, and for producing therefrom sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon minerals, in and under said lands, and also the exclusive right of drilling and operating thereon for sulphur, potash, oil, gas and/or other liquid or gaseous hydro-carbon minerals, together with a right of way for, and the right to lay pipelines to convey water, oil, gas, steam and sulphur, and the right to have sufficient water from the premises to drill and operate any wells which the said lessee may bore thereon, and also such other privileges as are reasonably requisite for conducting such operations, and the right to remove from said premises at any time any and all property that may have been placed thereon by lessee, provided that the said lessee shall have fulfilled its obligations to lessor hereunder."
The "NOW, THEREFORE" paragraph of the state mineral lease set forth above grants to the lessee "the right to remove from said premises at any time any and all property that may have been placed thereon by lessee . . ." It is clear that the canal in the present case was dredged to remove the equipment from two abandoned Texaco wells, and, therefore, the dredging of the canal took place under the terms of the state mineral lease.
It is interesting to note, however, that the mineral lease in Jurisich v. Louisiana Southern Oil & Gas Co., infra, specifically provided for the dredging of canals, where the mineral lease here does not contain any specific language authorizing the dredging of canals. The quoted provision of the lease does, however, grant to lessee "such other privileges as are reasonably requisite for conducting such operations . . ." which grant we feel includes the authority to dredge a canal if necessary for access to lessee's well site.
Under the holdings of Doucet v. Texas Co., 205 La. 312, 17 So.2d 340 (1944), Lauzon v. J. C. Trahan Drilling Contractor, Inc., 247 So.2d 236 (La.App. 4th Cir. 1971), and Jurisich v. Louisiana Southern Oil & Gas Co., 284 So.2d 173 (La.App. 4th Cir. 1973), the holder of a mineral lease granted by the state is liable to the owner of an oyster lease also granted by the state only if the mineral lessee is negligent, or conducts its operations without reasonable prudence and proper precaution. The mineral lessee must conduct its operations so as not to unduly cause damage to the oyster lessee. This brings us to the issue of negligence.

NEGLIGENCE
The trial court found that Texaco was negligent in the conduct of its dredging operations. We have read carefully the entire record, and the reasons for judgment, and, finding no manifest error in the holding on the issue of negligence of the learned trial judge, adopt his holding as our own, and quote from his written reasons for judgment:
*636 "Even assuming that Texaco had indeed offered evidence on and proved production and thus the existence of the mineral lease and rights flowing therefrom, this Court would still find defendants liable for failing to carry out its dredging operations in a reasonable, cautious and prudent manner. The burden is placed upon the mineral lessee to use reasonable prudence in order to minimize damages, and it cannot produce its operation in disregard of the rights of the oyster lessee. Lauzon v. J.C. Trahan Drilling Contractor, supra at page 240. The Court in Lauzon recognized that mineral lessees and oyster bed lessees each have valuable rights and such coexisting rights subject both to the rule that every person must so exercise his rights as not to unduly or negligently injure others; the issue being recognized as whether or not the mineral lessee had performed its operations in a manner in which a prudent person would have performed it.
"In its Post-Trial Memorandum, Texaco reiterates these rules, and further admits that it `would appear that in order to act in a reasonable and prudent manner, it would be imperative for a mineral lessee contemplating dredging to inspect the lease and ascertain where oysters were located so that he could take the steps to avoid damaging them. If it were not possible to completely avoid them, then it would seem that it would be incumbent upon the mineral operator to allow the oyster fisherman sufficient time to take the steps necessary to preserve his crop. Of course, the dredging activities themselves must necessarily be conducted in a safe and reasonable manner with regard to the oysters. Summing up, it would seem that the standard of reasonableness would include sufficient notice and sufficient time in which the oysterman would take the steps necessary to preserve his harvests.' It is obvious from the record that Texaco's actions did not meet up to these proclaimed rules.
"First, the record clearly reflects that Texaco was interested more in negotiating a monetary settlement for damages with the Voisins prior to dredging than with charting a dredge route to minimize damages to the oysters. The so-called inspections by Pilkington, the local Texaco representative apparently in charge of these dredging operations, were no more than attempts by him to negotiate a figure and obtain a release from liability for any actions by defendants prior to dredging. (Transcript pages 15 and 21).
"Texaco contacted the Voisins only through Pilkington. There is some evidence that Pilkington first met with Voisin on the lease in March, 1977. Pilkington attempted to negotiate a settlement with Voisin, who refused. At that time, the record shows Pilkington did not know the exact route of the future dredging operations nor did he know the extent of the dredging that was to be done. (Tr. p. 6) In fact, as late as July 20, 1977, the date of the first dredging, Texaco and Pilkington did not even know which wells would definitely be pulled and were even unsure as to the ownership of one of the wells (Tr. p. 21 regarding wells 9-1 or 9-5) (Compare to Transcript pages 14 and 20, where talk of wells 9-1 and 9-8 and transcript page 22 regarding 9-1, 9-5 and 9-8). Apparently from the record, the staking out of the dredging route of the first dredging operation by a survey crew was not accomplished until the very day dredging operations took place, July 20, 1977.
"Testimony by Pilkington was to the effect that Voisin pointed out the oyster locations to him in March and on July 20. Pilkington first testified he found `a few wild oysters right around the bank' and further testified that Texaco's survey crew `found no oysters of any consequence in the area', though Pilkington later admitted on cross-examination the existence of some good oyster reef in the lease (Tr. page 205). Texaco offered little but vague evidence through MacHenry, Texaco's chief of the survey crew, as to the dates and manner of the staking out of the dredging routes. Texaco, however, argues that its actions were reasonable.
"This Court completely disagrees. A reasonably prudent person would have made *637 certain as to the locations of all of the oyster reefs in the area, selecting the least damaging route. It is evident that from the beginning Texaco was not concerned with minimizing oyster damage but only with minimizing its own financial loss. In fact, the record is clear that Texaco all along intended to come to a straight path across the lease, and that neither Pilkington nor MacHenry checked all areas of the lease for oysters. Furthermore, on July 29, Mac-Henry, who was in charge of staking out the dredge route and thus should have been concerned with routing the dredge to areas with the least oysters, did not even accompany Mr. Voisin to check the oyster locations. (Transcript p. 233 and 209). It was Pilkington, the claims representative, who accompanied Voisin. And Pilkington admits that the dredge was moving in toward the lease at that time, Voisin was very upset, and that `we (at least meaning Pilkington, but possibly others; see Tr. p. 232 for those who were present) tried repeatedly to get him to give us some type of price, some kind of figure, that would cover the damages, and he would not do so.' (Tr. p. 21). On March 23, in the presence of `approximately the same survey crew,' it also was Pilkington and Voisin who were together to locate oysters. The Court believes the surveyors would have been the reasonable persons to accompany Voisin. Thus, it is evident to this Court that Texaco made no reasonable attempt to minimize damages to this oyster lease, but only to minimize their financial loss.
"It is also important to point out that this Court does not believe Texaco's evidence that there were no oysters of any consequence in the area to be dredged. The reasons for this disbelief will be elaborated later herein.
"The Court further finds that Texaco did not give the Voisins sufficient and adequate notice regarding the proposed dredging. The exact route to be dredged and exact wells to be pulled was never made clear to Mr. Voisin prior to the dredging. It was extremely unreasonable and careless to notify Voisin to meet at the lease on July 20 to discuss the potential dredging and to then confront him at that time with the impending dredge operations. The Court disapproves wholeheartedly with this maneuver by Texaco. Furthermore, Texaco's letter on August 4, 1977, to Voisin to remove his oysters was also too late; the first dredging had already occurred, doing its damage, and the second dredging occurred soon after the August letter. Thus, Texaco was grossly negligent in not, sufficiently in advance, arranging the inspection and staking out of the route with Voisin, who cooperated by meeting Texaco on the lease on both occasions when asked to do so. In fact, Pilkington himself admitted that many dredging operations by Texaco in the past were staked out well in advance of the dredging (Tr. p. 15). Texaco's failure to do so in this case was negligence.
"Finally, this Court further finds the defendants negligent in the manner in which the dredging operations were carried out. It is obvious that spoils (the dredged mud) were not carefully deposited away from the oyster reefs, but in fact were dumped onto the reefs in great quantities and allowed to spread and cover a vast amount of the oyster lease.
"Texaco attempted to show that Voisin wanted the spoil placed on the south side of the lease, in the Pass. However, Pilkington admitted that Voisin requested to put as little spoil as possible in the water `which we (meaning defendants) would have done anyway.' (Tr. p. 204). Antoine Hebert, dredge captain for Berry Brothers, Inc. who did the dredging on July 20, further testified that Voisin advised him to rehandle the spoil that was put in the water to keep the water open and oyster reefs clear, meaning to redig or rehandle the spoil and put in (sic) on the bank. (Tr. p. 214-219). Defendants claim to have done this. This Court does not believe this to be the case; it is obvious that if the defendants had performed the dredging in this manner, the oyster reefs could not have been covered with thick layers of spoil. This Court believes the testimony presented by plaintiff that indeed much of the oyster reefs in the lease were overburdened with spoil immediately *638 after the dredging operations, that immediately prior to this dredging, the lease contained no such spoil, and therefore the only reasonably explanation is that the two dredging operations by defendants proximately caused this spoilage. It is significant that plaintiff's evidence regarding this spoilage was bolstered by testimony of several independent witnesses who have no stake in the outcome of this litigation. It is also worth mentioning that Texaco offered no testimony whatsoever regarding the manner in which the August dredging was conducted, other than vague references thereto, though this point is not a controlling factor in this Court's determination of negligence, but just one of many which detracts from the credibility of the defendants' case, testimony and evidence. In short, it has been proved to the satisfaction of this Court that defendants caused the spoilage of the oyster lease with their negligent dredging.
"In summary, . . . even assuming the legal right of defendants under a mineral lease, defendants were in reckless disregard of plaintiff's property rights, negligently failing to check for and locate oyster reefs upon the lease, negligently waiting until literally the last minute to stake out dredging routes though the oyster lessee offered his cooperation, negligently failing to give the oyster lessee sufficient and adequate notice regarding the dredging, and negligently conducting the dredging operations. These actions by defendants have carelessly and needlessly destroyed a valuable resource of plaintiff, and thus liability for all damages ensues."
In Jurisich v. Louisiana. Southern Oil & Gas Co., supra, the court held that the defendant mineral lessee was negligent in failing to notify plaintiffs before the dredging commenced of the route selected. The purpose of the dredging in Jurisich was to provide access for a submersible drilling rig to the drilling site. The purpose of the dredging in the instant case was to enable Texaco, the mineral lessee, to remove equipment from two abandoned well sites. It would seem that the consequences of delay to a mineral lessee in the commencement of drilling would impose a substantially more sever economic hardship than the delay in retrieving equipment from abandoned wells. If, under the facts of Jurisich, the failure to notify the plaintiff oyster lessee of the route selected before dredging commenced was held to be negligence, certainly in this case the failure of Texaco to notify plaintiff of the dredging route selected before the commencement of dredging operations was negligence on the part of Texaco. The obligation of the mineral lessee to conduct its operations in a prudent and cautious manner under the circumstances of this case at the very least required the mineral lessee to carefully locate all of the oyster producing reefs, to select a dredging route as remote as practicable from the reefs, and then to give notice to the oyster lessee sufficiently in advance of the commencement of dredging operations as would allow the oyster lessee adequate opportunity to protect his reefs or minimize his losses.

CAUSATION
The trial court summed up the testimony quite well on the question of whether or not the spoil and silt from the dredging operations caused the destruction of the oysters on Mrs. Voisin's lease when it remarked simply that before the dredging operations the oysters were free from mud, and after the dredging the oysters were covered by mud, and, therefore, the dredging caused the destruction of the oysters.
There is little direct factual evidence to the contrary. Texaco's defense on the issue of causation is limited almost entirely to expert testimony of Dr. John G. Mackin, a retired professor at Texas A&M, who stated that there was little silt and that the current over the oyster beds in question was too swift (1 knot) to permit silt to be deposited. However, this testimony is refuted, as silt was found over the oysters by plaintiff's witnesses, and there is no reasonable explanation of its presence other than its having been deposited by the dredging operation. Furthermore, the reliability of Dr. Mackin's testimony can to some extent be questioned *639 by his admission under cross-examination that since his retirement he has drawn almost all of his earned income from oil companies, that he has worked for oil companies in almost 200 silting cases, and that he has found silting in only three or four cases.
We, therefore, agree with the trial court that spoil and silt from the dredging of the canal by Texaco caused the destruction of the oysters.

QUANTUM
On the question of quantum of damages, the trial court relied upon the testimony of two expert witnesses from the Louisiana Wildlife and Fisheries Commission, Claude Boudreaux and Philip Bowman, who both testified that most of the oysters had been destroyed by silt, and eight fishermen, who testified that the lease had been productive before the dredging began, and many of whom testified further that the lease became unproductive as a result of silt after the dredging. The trial court refused to believe the testimony of Charles Pilkington and Dr. Mackin, both of whom testified that there was little or no mud or silt in the oysters after the dredging. We do not find error in this evaluation of the credibility of witnesses.
As was stated in Arceneaux v. Adams, 366 So.2d 1025 (La.App. 1st Cir. 1978):
"It is well settled that factual findings of the trier of fact are entitled to great weight on appeal and, when there is a conflict of testimony, reasonable inferences of credibility and reasonable inferences of fact made and drawn by the trier of fact are not to be disturbed on appeal. Canter v. Koehring Company, 238 So.2d 716 (La. 1973)." (366 So.2d 1025, 1027)
The trial court found that at lest 35,000 sacks of oysters had been produced during the 14½ month period between Voisin's acquisition of the lease and the dredging operations. It found, therefore, that 29,000 sacks would have been produced in a 12 month period. It further found that after the initial year of harvesting oyster production would be reduced by approximately 20%, and thus arrived at a total loss of 23,000 sacks for 1977. The trial court then computed the lost income for a 12 month period at $3.25 per sack times 23,000 sacks or $74,750.00, after the 20% reduction.
The trial court held that there was sufficient evidence to prove that this oyster lease "could productively yield oysters at its 1977 rate for at least five years, if not longer, had it not been for the negligent dredging." However, the said trial court felt that under the holding in Lauzon v. J.C. Trahan Drilling Contractor, Inc., supra, it was limited in awarding damages for future losses to one year.
Accordingly, the trial court awarded damages to plaintiff in the amount of $74,750.00 for the initial loss of harvestable oysters in 1977, and in the same amount of $74,750.00 for the following year. Plaintiff was, therefore, awarded total damages of $149,500.00, together with legal interest and costs.
The trial court thus found that an award of damages for any more than an additional year would be deemed speculative (as a matter of law, presumably) under the holding in Lauzon v. J.C. Trahan Drilling contractor, Inc., supra. The holding in Lauzon that an estimate for damages for any more than one additional year would be speculative was based on the facts of that particular case, and was not an enunciation of a rule of law for all oyster damage cases. However, we see in the record presented in this case that Wilson Voisin, husband of the oyster lessee and an experienced oyster lease operator, states that the oyster lease bottoms could be put back in shape in 24 months or 3½ years and made productive of oysters. We, therefore, find no reversible error on the part of the trial court in limiting recovery of damages to one additional year.
In view of the usual difficulty involved in determining the amount of damages in these cases, we find that the trial court achieved a relatively high degree of accuracy in calculating the damages sustained by plaintiff and find no error in his award for damages.
*640 Accordingly, the judgment of the trial court is affirmed. Costs of this appeal to be borne equally by Berry Bros., Inc. and Texaco, Inc.
AFFIRMED.
NOTES
[1] The precise date of these leases does not appear in the transcript of testimony.