Loyman MELANCON; Rodney Eymard; and the E & M Oyster Company

v.

TEXACO, INC. and Houston Contracting, Inc.

Civ. A. No. 77–651.

United States District Court, E. D. Louisiana.

March 31, 1981.

Alma Chasez, for plaintiffs Loyman Melancon, Rodney Eymard, and E & M Oyster Company, Inc.

John Fitzmorris, New Orleans, La., for defendants Texaco, Inc. and Houston Contracting Co.

## OPINION

ROBERT F. COLLINS, District Judge.

This matter was tried to the Court, sitting without a jury, on January 31, 1980 through February 6, 1980. Post-trial briefs were filed on February 28, 1980. Closing arguments were heard on March 26, 1980. Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiffs in this matter are Loyman Melancon, Rodney Eymard and the E & M Oyster Company, Inc. All plaintiffs are domiciled in Louisiana, and the E & M Oyster Company, Inc. has its principal place of business in the Parish of Jefferson, State of Louisiana. Defendants in this matter are Texaco, Inc. and Houston Contracting, Inc. Defendant Texaco, Inc. has acknowledged its responsibility to defend Houston Contracting, Inc., and defendants do not contest the Court's diversity jurisdiction. *See* pretrial order, paragraphs 3, 4, record, document no. 56. The Court finds that defendants are not domiciled nor do they have their principal places of business in the State of Louisiana. The Court, therefore, finds that complete diversity of citizenship exists between plaintiffs and defendants.

2. The incidents made the subject matter of this litigation occurred in Barataria Bay, Parish of Jefferson, State of Louisiana. Plaintiffs allege that they were lessees of an oyster bed in Barataria Bay. Plaintiffs further allege that defendants damaged plaintiffs' leased oyster bed on February 1 and February 14, 1976, when defendants' drilling rig, Mr. Harvey, ran aground on or near the plaintiffs' oyster bed while the rig was being transported to and from a drilling site. Plaintiffs seek damages for the loss of oysters, contending that this loss was proximately caused by the groundings of the Texaco drilling rig.

3. Defendant, Texaco, Inc., is the owner of State Mineral Lease No. 356, executed May 11, 1936. This lease includes within its boundaries the waterbottoms located in Township 20 South, Range 24 East, Parish of Jefferson. Texaco's Mineral Lease was recorded in the Jefferson Parish conveyance records office at C.O.B. 129, folio 431. Mineral Lease No. 356 is coextensive with the Barataria Bay waterbed area leased by plaintiffs for the production of oysters.

4. At the time of the incidents made the subject matter of this cause, plaintiffs Loyman Melancon and Rodney Eymard were the lessees of State Oyster Lease number 15944. At trial, plaintiffs proved their chain of title by introducing the testimony of Michael L. Myers, Sr., a surveyor employed by the Louisiana Wildlife and Fisheries Commission. Factually, there is little dispute as to the chronology of plaintiffs' acquisition of the oyster lease in question. The parties instead heatedly contest the legal significance of the chain of title.

The testimony of Myers demonstrated that the oyster beds in question were first leased by Emile Bouvier, who applied for State Oyster Lease number 15944 on December 14, 1959. *See* Exhibit D–13 for a map of the area in question. On November 7, 1960, State Oyster Lease number 15944 was granted to Bouvier. *See* Exhibit P–1, A–2. That lease expired January 1, 1975. The area leased was east of the Middle Bank Light, a landmark which appears on all the maps.

At an undetermined time, Bouvier transferred his interest in lease 15944 to Nelson Duet. *See* Exhibit P–1a. Subsequently, on January 31, 1969, Duet assigned the entire lease to Louis J. Eymard, plaintiff Rodney Eymard, Louis Eymard's son, and to plaintiff Loyman Melancon, Louis Eymard's son-in-law. *See* Exhibit P–1a. Significantly, plaintiff E & M Oyster Company was not a party to this assignment because it was not formed until 1974. There is no evidence in the record which demonstrates that the E & M Oyster Company ever obtained an interest in this oyster lease after the company's formation in 1974.

On December 30, 1974, prior to the expiration of lease 15944, plaintiffs Melancon and Eymard filed an application numbered U577 to renew the western portion of lease 15944, plus an additional fifty acres. Exhibit P–1b. At the same time, Louis J. Eymard, the father of plaintiff Rodney Eymard, filed an application to renew the eastern portion of lease 15944. Because of a backlog of work at the Louisiana Wildlife and Fisheries Commission, the lease area plaintiffs sought to renew was not surveyed until February 23, 1976. On May 24, 1976, a new lease was granted, numbered 23485. *See* Exhibits P1–6, D–17. Significantly, the 1976 lease named only Rodney Eymard and Loyman Melancon as lessees. No mention was made of the E & M Oyster Company as lessee. The testimony of Myers makes it clear that pursuant to the policies implemented by the Louisiana Wildlife and Fisheries Commission, plaintiffs' lease remained legally valid from the period of January 1, 1975 through May 23, 1976, the period of time during which plaintiffs' renewal application, number U577, was on file.

The Court finds that plaintiffs Melancon and Eymard were the lessees of oyster lease 15944 during February 1976, at the time of the incidents made the subject matter of this litigation. The Court also finds that plaintiff E & M Oyster Company was not a lessee of oyster lease 15944 at the time of the incidents made the subject matter of this litigation. The Court further finds, based upon the evidence presented, that lease 15944 and application U577 were properly recorded with the Louisiana Wildlife and Fisheries Commission and in the conveyance office books of the Parish of Jefferson. *See* Exhibits P–1A, P–1B. Furthermore, the testimony of Lawrence W. Holzenthal, Jr., Texaco's district surveyor in charge of plotting the proposed route for the rig, Mr. Harvey, demonstrates that Holzenthal was aware of the existence of plaintiffs' lease, number 15944. Holzenthal testified that his maps showed the location of the lease in question, at the time he plotted Mr. Harvey's route to and from the drill site.

5. In February of 1976, defendant Texaco began moving its drilling rig, Mr. Harvey, to a drill site identified as well number 19. The rig, Mr. Harvey, is a 200 foot by 50 foot by 14 foot submersible steel drilling barge. *See* D–12. The final drill site location was several hundred feet west of the northwestern corner of oyster lease 15944. Testimony of Lawrence Holzenthal; *see also* defendant's exhibits 13, 17. It was the responsibility of defendant's employee, Lawrence Holzenthal, to plot the route of ingress and egress of the drilling rig to well number 19. Holzenthal testified that on January 7, 1976, he went out to the area in question and sounded the bottom of the bay to obtain information as to the depth of the water. While performing these soundings, Holzenthal testified that he saw oyster poles, which are used by oyster men to stake the boundaries of an oyster lease. Significantly, Holzenthal testified that when his crew sounded that part of the proposed route near plaintiffs' oyster bed for water depth, he made no notation as to whether the tide was high or low. At trial, Holzenthal acknowledged that great tidal fluctuations occur in Barataria Bay depending upon the time of day and the weather. Holzenthal also testified that the Mr. Harvey draws five and one-half feet to seven feet of water. Based upon the testimony and the evidence, the Court finds that the water depth near the oyster lease would have to exceed seven feet, at the time the rig was moved, to avoid a grounding on the bottom of Barataria Bay.

The final route selected for the movement of the rig is shown in defendant's exhibit 6–C. The rig was to travel north in the Freeport Channel, a channel east of plaintiffs' oyster leases. At the point where the rig was slightly north of lease 15944, it was to make a right angle turn to the west, and proceed between oyster leases 15944 and 17102. *See* defendant's exhibits 13, 21. The final drilling site of well 19 was located to the west of the northwest corner of lease 15944. *See* defendant's exhibit 21.

6. On the evening of January 31, 1976, the rig Mr. Harvey commenced its voyage

to well 19. Defendant's employee Luther Strahan, a Texaco drilling and production foreman for twelve years, was responsible for the navigation of the rig as it moved toward the well site. There was no engineer present, although Strahan testified he had the authority to request the presence of an engineer. Strahan also testified that some times engineers were present when rigs moved onto location. In the early morning hours of February 1, 1976, the rig proceeded north in the Freeport Channel. Several hundred feet north of oyster lease 15944, the rig executed a right angle turn to the west. Strahan testified that after the rig left the Freeport Channel and turned to the west, it grounded just to the north of oyster lease 15944. *See* defendant's exhibit 2. Strahan also testified that the water depth where the rig went aground was approximately six feet.

No clear evidence was presented from which the Court could determine the speed the rig was moving when it grounded. However, the severity of the grounding may be inferred from the evidence plaintiffs presented dealing with the means employed to free the rig. Strahan testified that three tugs and a spud barge were used to free the rig and that this equipment was in use for ten and one-half hours before the rig was freed. Strahan acknowledged that the length of time involved in this operation demonstrates that the rig was badly grounded. After the rig was freed, it proceeded to the location where well 19 was to be drilled.

7. The rig Mr. Harvey began moving off location from well 19 on February 13, 1976. *See* D–2, at p. 32. The route of egress from the drill site was the same as the route of ingress. Strahan testified that by 11:00 p.m. on February 13, 1976, the rig grounded at the same area where the grounding occurred on the way to well 19. Strahan testified that the water depth was seven feet at the time of the second grounding, and that the grounding occurred because of low tides prevalent in that area during February. Significantly, Strahan testified that he did not check the tides or water depths before moving off location from well 19.

Again, as in the first grounding, three tugs and a spud barge were used to free the rig. Defendant's Drilling Report for February 15, 1976, *see* D–2, indicates that three tugs and a spud barge pushed and pulled the rig for a period of nine and one-half hours before the rig was freed.

8. The Court finds that the two groundings of the rig created severe dislocations of soil and mud which significantly effected the environment on and near plaintiffs' oyster bed. Additionally, the conditions created on the bottom of the bay were greatly aggravated by the methods the three tugs and the spud barge used in twice freeing the rig. Strahan's testimony provided the best analysis of how the spud barge and tugs actually succeeded in freeing the grounded rig. The tugs would first position the spud barge in front of the rig. The spud barge would next plant its spuds in the bottom of the bay and then attach lines to the rig. The tugs would then proceed to the sides and rear of the rig, where the tugs would wheel wash, while waiting for the spud barge to pull the rig forward. After the tugs' wheel washing, the spud barge's winches would pull the grounded barge forward, while the tugs pushed the rig forward. Strahan testified that wheel washing is a process whereby tugs wash mud up from the bottom of the bay. Wheel washing assists in moving grounded vessels because the tugs' propellers dig up the bottom of the bay, churning up mud and soil from the grounded area onto adjacent bottom areas. The process creates greater water depth as water fills the area where the tugs' propellers dig up the bottom.

9. The Court finds that a substantial amount of bottom soil was relocated and disturbed on or near plaintiffs' oyster bed as a result of the two groundings which occurred and as a result of the methods twice used to free the grounded rig. Plaintiffs called Robert Wayne Courtier as an expert witness in the field of mechanical engineering. Courtier testified that as a result of the events associated with the two groundings, as much as 20,400 cubic yards of soil, sand, or other materials were dis-

placed from the bay bottom. Courtier estimated that if this volume of materials was evenly spread over the ninety-four acre oyster bed leased by plaintiffs, approximately one and one-half inches of material would coat the surface of the oyster beds. Robert P. Waldron also testified as an expert on plaintiffs' behalf. Waldron is a geologist who does consultant work on problems involving oyster beds. He also appraises oyster leases. Waldron testified that the disturbances associated with the groundings of the rig would add between three-fourths of an inch to a one inch layer of materials to plaintiffs' oyster bed. Waldron testified that the volume of these materials would increase greatly when mixed with water.

10. Plaintiffs seeded their oyster bed in the months of September through November, 1975. It is the common industry practice to harvest at least one sack of oysters for every sack planted or seeded. Generally, oysters are harvested in the spring and summer months. Michael Eymard, the son of plaintiff Rodney Eymard, testified that plaintiffs planned to harvest 50% of the crop planted in the autumn of 1976 during the months of April through August, 1977. Plaintiffs planned to harvest the remaining 50% of the oyster crop in the summer of 1977. The testimony also demonstrated that the oyster bed in question was very fertile because it was covered by shell and gravel, creating a very hard surface.

Plaintiffs initially discovered problems with their oyster crop in April 1976, when representatives of the Louisiana Wildlife and Fisheries Commission sampled their oysters to test for size and mortality rates. Wildlife and Fisheries representatives were summoned to Barataria Bay by the Duet family, holders of oyster lease number L–21767. The Duet oyster bed lies just west of plaintiffs' oyster bed. *See* D–13. Curtis Duet testified that oysters on L–21767 sustained damage as a result of the jetting in of a Texaco flow line, which occurred during the drilling operations on well 19. Curtis Duet testified that towards the end of March 1976, he discovered dead and blackened oysters on his lease, which had been suffocated by mud. Duet requested assistance from the Wildlife and Fisheries Commission to determine the extent of the loss. Mr. Robert Ancelet, a marine biologist employed at Wildlife and Fisheries for over ten years, investigated Duet's complaint.

After taking samples on the Duet lease, Ancelet went to plaintiffs' oyster bed where three samples were taken to provide a comparison. Ancelet discovered that plaintiffs' oysters were stained black, whereas healthy oysters are golden-brown in color. Ancelet concluded that the sampled oysters were anaerobic or lacking oxygen and found mortality rates of 12%, 12%, and 16%. In June of 1976, Ancelet again took three samples from plaintiffs' oyster bed and discovered sharply higher mortality rates of 44%, 54%, and 53%. According to Ancelet, the oysters sampled were black, indicating a continuing anaerobic condition. Ancelet explained that an oyster need not be totally buried to suffocate, because, in his opinion, suffocation can occur if the oyster's gills are blocked by silt. Other witnesses called by plaintiffs similarly testified that the oysters harvested from April through June, 1976 were blackened and dead. Michael Eymard testified that there was a great deal of mud on the oyster shells and that the water in the lease area was discolored. Plaintiff Loyman Melancon testified that the oysters he harvested were black and covered with sand and mud. Plaintiff Rodney Eymard also testified that the oysters were black and dead when harvested. Significantly, Eymard testified that as plaintiffs harvested at deeper levels, the oyster mortality rate increased. Because of the conditions of the oyster bed, plaintiffs decided to harvest or dredge the entire lease area. Plaintiff Loyman Melancon testified that plaintiffs planted 33,676 sacks of oysters in the autumn of 1976 and expected to harvest at least that many sacks. Only 8,412 sacks of oysters were saleable, and they were sold at the rate of $6.00 per sack. The remaining 25,264 sacks of oysters were either dead or unsaleable because of their blackened, anaerobic condition.

11. At trial, the parties vigorously contested the issue of causation. In the opin-

ion of plaintiffs' expert witnesses, Robert Ancelet, Robert P. Waldron, and Edwin Cake, the displacement of great volumes of mud and silt caused the damage to plaintiffs' oyster crop. All of plaintiffs' expert witnesses testified that it was unnecessary for an oyster to be totally buried to produce the blackened, anaerobic condition which rendered these oysters unsaleable. Instead, plaintiffs' expert witnesses concluded that if the levels of mud and silt were sufficient to block an oyster's gills, an anaerobic condition would result. Defendant's expert witnesses, on the other hand, sharply disagreed with plaintiffs' expert witnesses. Dr. Samuel Ray, an expert in the field of marine biology, and Dr. John G. Mackin, an expert in the fields of marine biology, sedimentation, and estuary ecology, both testified that the damages to plaintiffs' oyster crop resulted from parasitic infections or dermo. Mackin explained that dermo is an infection which attacks the oyster's outer layer of skin by dissolving the skin tissue. Further Mackin and Ray asserted that total immersion in mud or silt is necessary before an oyster would suffocate.

In stating their conclusions and opinions, defendant's expert witnesses placed great emphasis upon the tests conducted by Robert Ancelet in April and June of 1976. In the April test, Ancelet's three samples of oysters from plaintiffs' bed revealed mortality rates of 12%, 12%, and 16%. The results of Ancelet's June test revealed mortality rates of 44%, 54%, and 53%. From this data, defendant's expert witnesses concluded that the oyster mortality rate resulted from either parasitic infection or dermo. They reasoned that if the oyster crop damage resulted from the disturbance to the environment caused by the groundings and defendant's efforts to free the rig, the mortality rates would have been higher in April when Ancelet first performed a test. Defendant's expert witnesses testified that parasitic infection, or other oyster diseases, spread rapidly in the spring and summer as weather conditions elevate water temperatures. Based upon Ancelet's findings of increased oyster mortality in June, and based on the opinion that total submersion in mud or silt is necessary to cause oyster suffocation, defendant's expert witnesses concluded that oyster disease, parasitic infection, and/or dermo damaged plaintiffs' oyster crops.

After careful consideration of the opposing conclusions and opinions stated by the experts at trial, the Court finds that the damage to plaintiffs' oysters was caused by the disturbance of the oyster bed environment resulting from the two groundings of the rig and the efforts to free the rig. The Court is convinced that the theories offered by plaintiffs' expert witnesses provide the most logical explanation of why plaintiffs' oysters were black, anaerobic and thereby unsaleable. The Court is of the opinion that defendant's expert witnesses failed to consider pertinent information, supported by facts in the record, which explain the different mortality rates reported in Ancelet's April and June tests. Plaintiff Rodney Eymard specifically testified that plaintiffs discovered higher mortality rates as they harvested the deeper levels of their oyster crop. On cross examination, Eymard explained that the different mortality rates reported in the April and June samples resulted from Ancelet sampling the top layers of oysters in April as compared with the bottom layers of oysters in June. Ancelet was able to sample the bottom layers of oysters in June because, according to the testimony of plaintiffs Loyman Melancon and Rodney Eymard, and Curtis Duet, who assisted plaintiffs, they began partial dredging of plaintiffs' oyster bed after receiving the results of Ancelet's April test. Thus, by the time Ancelet returned in June of 1976 to repeat his test, he obtained samples from deeper layers where the damage caused by the disturbance to the oyster bed environment had a more severe impact.

12. As previously stated, the oysters in question were bedded in the autumn of 1976. Following industry practice, plaintiffs planned to harvest 50% of their crop in the summer of 1976 and harvest the remaining oysters in the summer of 1977. Plaintiff Loyman Melancon testified that under normal circumstances, he would have

allowed the lease area to lie fallow in the autumn of 1977 so that the lease area would be replenished for seeding in the autumn of 1978. Plaintiff Loyman Melancon also testified that the oyster bed was ready for normal seeding by the autumn of 1979. In an effort to mitigate their damages, plaintiffs harvested or dredged the entire lease area during the spring and summer of 1976. Plaintiffs were advised that by so acting, the oyster bed would return to its previous hard, shell surface in a shorter amount of time. Plaintiff Loyman Melancon testified that plaintiffs planted 33,676 sacks of oysters in the autumn of 1976. After harvesting the entire crop, only 8,412 sacks of oysters were sold at the rate of $6.00 per sack. The remaining 25,264 sacks of oysters were either dead or unsaleable because of their blackened, anaerobic condition. Melancon testified that of these lost sacks, 50% or 12,632 sacks would have been sold in 1976, when the market price was $6.00 per sack, yielding a loss of $75,792.00. The remaining 12,632 sacks would have been sold in 1977 when the market price fluctuated from $8.50 to $10.00 per sack, according to Melancon. Taking the average of these figures, $9.25, the Court finds that plaintiffs lost $116,846.00 in 1977. Thus plaintiffs' loss in 1976 and 1977 amounted to $192,638.00.

Plaintiffs also seek damages for their lost profits sustained as a result of their inability to plant on their oyster bed until the autumn of 1979. As the Court previously found, plaintiffs planned to allow the oyster bed to lie fallow from the autumn of 1977 through the autumn of 1978. In autumn 1978, plaintiffs planned to seed their oyster bed to harvest oysters in the summers of 1979 and 1980. Plaintiffs seek damages for their inability to plant a crop in 1978. At trial, however, plaintiffs failed to carry their burden of proof in establishing what losses, if any, they incurred in 1978 and after. No attempt was made to show what, if any, operating expenses or overhead plaintiffs incurred. This proof was unnecessary for the oyster crop seeded in the autumn of 1975, because for that crop, plaintiffs had already incurred all the ex-penses normally associated with overhead. However, to prove future lost income for crops seeded after 1975, it was necessary for plaintiffs to show what amount of their expenditure constituted overhead. It was also necessary for plaintiffs to prove what their net profit would have been by subtracting the amount of overhead from their predicted gross profits. Plaintiffs failed to do this. Instead, Loyman Melancon testified that plaintiffs would have planted approximately 33,000 sacks of oysters in September of 1978, which he would have harvested in the spring and summer of 1979. At trial, Melancon testified that in the spring and summer of 1979, oysters were being sold at $12.00 to $15.00 per sack. Counsel for plaintiffs submitted Exhibit P–12, entitled E & M Oyster Records, as proof of the amounts constituting overhead. However, that exhibit does not illuminate which expenses set forth therein constitute overhead. Accordingly, because plaintiffs did not carry their burden of proof, the Court can not award damages for alleged future lost income resulting from plaintiffs' inability to plant an oyster crop in September 1978. The Court notes that the testimony demonstrated that the oyster bed was suitable for seeding again in September 1979.

13.. To the extent that these Findings of Fact constitute Conclusions of Law, they are specifically adopted as both Findings of Fact and Conclusions of Law.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over this cause because the parties are citizens of different states and the amount in controversy exceeds $10,000.00. 28 U.S.C. § 1332(a). Venue is properly laid in the Eastern District of Louisiana, because all plaintiffs reside herein and the claim arose herein. 28 U.S.C. § 1391(a).

2. At trial, and in its post-trial memorandum, defendant challenged the status of E & M Oyster Company, Inc. as a party plaintiff, on the grounds that the E & M Oyster Company, Inc. was not a lessee of

the oyster bed in question. Defendant also challenged the right of plaintiffs Melancon and Eymard "to maintain this action on the grounds that at the time of the grounding of the Mr. Harvey they did not possess a recorded lease of the property in question." Defendant's Post-Trial Memorandum, at p. 2. Defendant bases his argument on the following statute, which grants oyster bed lessees a right of action for damage to beds:

A lessee of oyster beds or grounds who has obtained, recorded and marked his lease in compliance with the law shall have the right to maintain an action for damages against any person, partnership, corporation or other entity causing wrongful or negligent injury or damage to the beds or grounds under lease to such lessee. Such action shall be brought within one year of the occurrence of the wrongful or negligent act, or within one year of the date of discovery of such act, whichever last occurs.

La.Rev.Stat.Ann. § 56:461 (West Supp. 1981); 1976 La. Acts No. 58 § 1.

Defendant concedes that this statute took effect on October 1, 1976, several months after the date of the groundings at issue. However, defendant contends that La.Rev. Stat.Ann. § 56:461 should be applied retroactively because this statute codifies prior jurisprudence.

■ It is evident that the lease relationship between the State of Louisiana and oyster bed lessees gives rise to a cause of action for tortious damage to oyster beds. As the Court previously found, no lease relationship ever existed between the State of Louisiana and the E & M Oyster Company. Plaintiffs Melancon and Eymard filed an application for the renewal of lease 15944 on December 30, 1974, two days prior to the expiration of their lease. The E & M Oyster Company was formed in 1974, but no evidence was presented at trial that the E & M Oyster Company ever received an interest in the lease in question, or that the E & M Oyster Company ever had a lease relationship with the State. For these reasons, the Court will and hereby does DISMISS the claims of the E & M Oyster Company, and the Court will further DISMISS the E & M Oyster Company as a party plaintiff herein.

■ However, the Court holds that plaintiffs Melancon and Eymard (hereinafter plaintiffs) did possess leasehold rights at the time of the incidents sued upon. The Court has previously found that plaintiffs took all necessary steps to timely renew their lease. Plaintiffs' renewal application was properly on file with the Louisiana Wildlife and Fisheries Commission from December 30, 1974 through May 23, 1976, when the Commission completed the final administrative tasks, prior to its reissuance of plaintiffs' lease. It is the opinion of the Court that an inequitable and unjust result would be reached by denying plaintiffs a leasehold interest in the oyster bed in question because of the backlog of surveying work performed by the undermanned staff of the Louisiana Wildlife and Fisheries Commission.

■ Recent jurisprudence and Louisiana statutory amendments buttress the Court's holding that plaintiffs who timely file renewal oyster lease applications should not be denied leasehold interests because of the work backlog at the Louisiana Wildlife and Fisheries Commission. La.Rev.Stat. § 56:426 (West Supp.1981) provides in pertinent part:

All leases made under the provisions of R.S. 56:421 through R.S. 56:463 begin on the day the lease is signed and continue for a period of fifteen years and thereafter shall carry the first right of renewal for successive periods of fifteen years each, as long as the lease is capable of supporting oyster populations. Any renewal lease shall be made subject to the provisions of R.S. 56:421 through R.S. 56:463 and subject to the rules and regulations established thereunder by the commission. Renewal leases shall be executed by the secretary....

The Secretary has sixty days from the date of expiration of a lease to execute a renewal lease; however, if a renewal lease is not executed within this sixty day period the lease is automatically renewed.

In either situation, the fifteen year period of renewal lease shall begin on the first day following the expiration date of the prior lease.

A resurvey and plan of the water bottom, included in a renewal lease, shall be made by the department, at the expense of the leaseholder and at the fee set by the commission. However, this resurvey and plan may be made subsequent to the beginning date of a renewal lease. . . .

1980 La. Acts, No. 201 § 1; 1975 La. Acts, No. 194 § 1.

Clearly the legislative intent expressed in this statute is one of applying the principles of reconduction to the lease relationship between the State and an oyster bed lessee. *See La.Civ.Code Arts.* 2688, 2689. The jurisprudence construing this statute makes it apparent that the State must grant a former oyster bed lessee the right of first renewal of his lease. In a recent case decided by the Louisiana Fourth Circuit Court of Appeals, an oyster bed lessee brought suit against the Louisiana Wildlife and Fisheries Commission for failing to renew six of his oyster leases. The Court upheld the Commission's actions because the Commission converted these areas into State oyster seed grounds and the Commission did not release the beds to another party. In discussing the meaning of *La.Rev.Stat.Ann.* § 56:426, the Court stated:

> Indeed, it may be argued that Section 426's provision for "the privilege of renewal" means no more than Section 424's provision that every lessee has "first right of renewal": The Commissioner may not lease a tract upon the expiration of a lease to anyone other than the present lessee without first allowing the lessee the opportunity to renew. Furthermore, unless privilege means first right of renewal, the lessee under Section 426 (as amended in 1975) may forever exercise his "privilege" of renewing for successive 15 year periods.

*Vujnovich v. Louisiana Wildlife and Fisheries Commission,* 376 So.2d 330, 331 (La. App. 4th Cir. 1979).

The Court, therefore, holds that at the time of the incidents sued upon, plaintiffs did possess a valid lease of the oyster beds in question.

■ Nevertheless, defendant further argues that plaintiffs' failure to record the lease until May 24, 1976 defeats their right of action. The Court initially notes that plaintiffs properly filed renewal applications and awaited the conclusion of administrative functions performed by the Wildlife and Fisheries Commission before plaintiffs could record their lease. The Court also notes that the Louisiana law of registry, *see La.Civ.Code Arts.* 2251–2266, *McDuffie v. Walker,* 125 La. 152, 51 So. 100 (1909), protects third party purchasers from private understandings concerning title to property not made part of the public records. The intent of the public records doctrine is to shield innocent purchasers from any unknown information, not set forth in the public records, relevant to the encumbrances upon and the validity of title to property. Counsel for defendant has cited no cases, and the Court has been unable to discover any jurisprudence wherein an alleged tortfeasor, whose acts result in damage to property, successfully relied on the public records doctrine to defeat recovery by the owner of that property. The Court holds that where oyster lessees demonstrate that they are lessees of an oyster bed allegedly damaged by defendant's tortious conduct, plaintiffs' failure to record cannot bar their right of action in tort when the failure to record is not caused by plaintiffs' negligence but instead results from a backlog of work in the State agency responsible for issuing oyster leases. Accordingly, the Court concludes that plaintiffs have a right of action to seek recovery from defendant for the incidents sued upon.

■ 3. In this case defendant, a mineral lessee, and plaintiffs, oyster lessees, held coextensive leases to water beds wherein the incidents sued upon occurred. In determining whether defendant was negligent, the following jurisprudence is controlling:

Under the holdings of *Doucet v. Texas Co.*, 205 La. 312, 17 So.2d 340 (1944), *Lauzon v. J. C. Trahan Drilling Contractor, Inc.*, 247 So.2d 236 (La.App. 4th Cir. 1971), and *Jurisich v. Louisiana Southern Oil & Gas Co.*, 284 So.2d 173 (La.App. 4th Cir. 1973), the holder of a mineral lease granted by the state is liable to the owner of an oyster lease also granted by the state only if the mineral lessee is negligent, or conducts its operations without reasonable prudence and proper precaution. The mineral lessee must conduct its operations so as not to unduly cause damage to the oyster lessee.
*Voisin v. Berry Bros., Inc.*, 387 So.2d 633, 635 (La.App. 1st Cir. 1980) (*Voisin*).

The Louisiana Fourth Circuit Court of Appeal set forth the legal standards applicable herein as follows:

Faced squarely with the issue for the first time, we hold that a mineral lessee is not liable to an oyster lessee of coextensive property for damages resulting from necessary and prudent activities incident to the mineral lease, *when the activities are conducted with reasonable skill and with proper precautions.*
*Jurisich v. La. Southern Oil & Gas Co.*, 284 So.2d 173, 178 (La.App. 4th Cir. 1973) (emphasis added) (*Jurisich*).

The Court holds that in moving the rig, Mr. Harvey, to and from well site 19, defendant failed to act either prudently or with reasonable skill. The Court further holds that defendant failed to take proper precautions in moving the rig.

Based upon the testimony of defendant's employees, this Court holds that defendant acted in a negligent fashion. Lawrence Holzenthal was responsible for plotting the rig's route of ingress and egress to the well site. Holzenthal testified that on January 7, 1976, he sounded the bottom of the bay to obtain information as to the water depth. Significantly, Holzenthal testified that at the time he made these depth soundings, he made no notation as to whether the tide was high or low. As the Court has stated in its Findings of Fact, Holzenthal acknowledged that great tidal fluctuations occur in Barataria Bay. The Court holds that Holzenthal's failure to consider the relationship between water depth and tidal fluctuations in drawing up the rig's route of ingress and egress to the well site, demonstrates a lack of prudence and reasonable skill.

As the Court's Findings of Fact indicate, the rig became severely grounded during its route of ingress to the well site. During its egress from the well site, the rig went aground in the same area. Luther Strahan, defendant's employee who was responsible for the navigation of the rig to and from the well site, testified that prior to leaving the well site, he made no effort to ascertain water depths or tidal fluctuations. The Court holds that Strahan's conduct constitutes negligence for the following reasons: Strahan was responsible for the navigation of the rig when it went aground during its route of ingress. As the navigator of the rig, Strahan was present while three tugs and a spud barge labored for ten and one-half hours to free the rig when it first went aground. However, Strahan failed to request from defendant's engineering department alternative routes of egress from the well site. Instead, he attempted to follow the same route of egress as traveled during ingress, without seeking an updated evaluation of water depth or tidal fluctuations. "The burden is placed upon the mineral lessee to use reasonable prudence in order to minimize damages, and he cannot conduct his operation in disregard of the rights of the oyster lessee." *Lauzon v. J. C. Trahan Drilling Contractor, Inc.*, 247 So.2d 236, 240 (La.App. 4th Cir.) *writ denied* 259 La. 69, 249 So.2d 206 (1971). The Court therefore holds that the two groundings and the damages to plaintiffs' oyster beds caused thereby resulted from defendant's failure to conduct its activities "with reasonable skill and with proper precautions." *Jurisich*, 284 So.2d at 178.

4. The Court has previously found that as a result of the two groundings and the methods used to twice free the rig, a substantial amount of bottom soil was distributed over plaintiffs' oyster crop. Further, the Court has also found that the damage

to plaintiffs' oysters was caused by the disturbance on and near the oyster bed environment, occasioned by the two groundings and the methods used to twice free the rig. After carefully weighing the testimony of the expert witnesses presented by plaintiffs and defendant, the Court considers the following quotation to be relevant to the issue of causation:

> The trial court summed up the testimony quite well on the question of whether or not the spoil and silt from the dredging operations caused the destruction of the oysters on Mrs. Voisin's lease when it remarked simply that before the dredging operations the oysters were free from mud, and after the dredging the oysters were covered by mud, and, therefore, the dredging caused the destruction of the oysters.

> *Voisin*, 387 So.2d at 638.

The Court considers these comments to be applicable to the instant matter. The *Voisin* court then went on to question the reliability of defendant's expert witness, Dr. John G. Mackin, who testified for Texaco in the instant matter, on the grounds "that he has worked for oil companies in almost 200 silting cases, and ... has found silting in only three or four cases." *Voisin*, 387 So.2d at 639. This Court holds that the two groundings of the rig and the methods used to twice free the rig caused the damages to plaintiffs' oyster crop.

5. To the extent that these Conclusions of Law constitute Findings of Fact, they are specifically adopted as both Findings of Fact and Conclusions of Law.

6. Accordingly, for the reasons aforestated, the Court will and hereby does DISMISS the claims of the E & M Oyster Company and the Court will and hereby does DISMISS the E & M Oyster Company as a party plaintiff herein. The Court will and hereby does GRANT JUDGMENT in favor of plaintiffs Loyman Melancon and Rodney Eymard against defendants Texaco, Inc. and Houston Contracting, Inc., jointly and in solido, in the true and full amount of One Hundred Ninety-Two Thousand Six Hundred Thirty-Eight Dollars and No Cents ($192,638.00), with interest from date of judicial demand, and with costs taxed to defendants.